Kennedy, J.
I. Introduction
{¶ 1} The United States District Court for the Northern District of Ohio, Eastern Division, has certified the following question to this court pursuant to S.Ct.Prac.R. 9.01: “Does Ohio follow the ‘at the well’ rule (which permits the *525 deduction of post-production costs) or does it follow some version of the ‘marketable product’ rule (which limits the deduction of post-production costs under certain circumstances)?”
{¶ 2} Under Ohio law, an oil and gas lease is a contract that is subject to the traditional rules of contract construction. Because the rights and remedies of the parties are controlled by the specific language of their lease agreement, we decline to answer the question of law submitted by the United States District Court for the Northern District of Ohio, Eastern Division, and we dismiss the cause.
II. Facts and Procedural History
{¶ 3} The action in the federal court is a putative class action in which respondents here, Regis and Marion Lutz, Leonard Yochman, Joseph Yochman, and C.Y.Y., L.L.C., the landowner-lessors, claim that petitioner, Chesapeake Appalachia, L.L.C., the lessee, underpaid gas royalties under the terms of their leases. The leases in this case were signed in 1970 and 1971. Both petitioner and respondents agree that by the early 1990s, deregulation had significantly changed the natural-gas market.
{¶ 4} It is undisputed that under each lease, the lessee must bear all the production costs, i.e., the costs of producing the gas from below the ground and bringing it to the wellhead. The dispute centers on postproduction costs, i.e., the costs incurred after the gas is produced at the wellhead and before it is sold. Those postproduction costs may include, among other costs, the cost of gathering the gas from various wells, the cost to process and compress the gas, and the cost of transporting the gas to the point of sale.
{¶ 5} In its certification order to this court, the federal court set out the royalty clauses found in the leases:
[1] The royalties to be paid by Lessee are * * * (b) on gas, including casinghead gas or other gaseous substance, produced and sold or used off the premises or for the extraction of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale.
[2] Lessee [sic, Lessor] to receive the field market price per thousand cubic feet for one-eighth (1/8) of all gas marketed from the premises.
[3] Lessee covenants and agreed to deliver to the credit of the Lessor, as royalty, free of cost, in the pipeline to which the wells drilled by the Lessee may be connected the equal one-eighth part of all Oil and/or Gas produced and saved from said leased premises.
*526 {¶ 6} At issue is whether the lessee is permitted to deduct postproduction costs from the lessors’ royalties, and, if so, how those costs are to be calculated.
{¶ 7} The lessors assert that under the language of the leases, which specifies that royalties are to be paid based on “market value at the well” or the “field market price,” postproduction costs should not be deducted from the sale price before the royalty payments are calculated. The lessors further argue that because there is no market at the well, the lessee has an implied duty to market the product once it is severed from the wellhead and the lessee must bear the cost of bringing the product to the market.
{¶ 8} The lessee asserts that the plain language of a lease controls and that when a lease specifies that the owner’s royalty is based on the value of the product at the well, any postproduction costs must be deducted from the sale price to arrive at the well price before the agreed-upon royalty can be calculated. The lessee also disputes the factual veracity and relevance of the lessors’ contention that there is no market at the well. The lessee argues that regardless of where the gas is sold, the lease language provides for royalty payments based on the value of gas at the well.
III. Law and Analysis
{¶ 9} In Ohio, oil and gas leases are contracts. Harris v. Ohio Oil Co., 57 Ohio St. 118, 129, 48 N.E. 502 (1897). “The rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument * * *." Id. Accord Chesapeake Exploration, L.L.C. v. Buell, 144 Ohio St.3d 490, 2015-Ohio-4551, 45 N.E.3d 185, ¶ 53. It is a well-known and established principle of contract interpretation that “[contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.” Skivolocki v. E. Ohio Gas Co., 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus. “Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning.” Graham v. Drydock Coal Co., 76 Ohio St.3d 311, 313-314, 667 N.E.2d 949 (1996). This is particularly true “when circumstances surrounding an agreement invest the language of the contract with a special meaning, [because] extrinsic evidence can be considered in an effort to give effect to the parties’ intention.” Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Util. Comm., 129 Ohio St.3d 485, 2011-Ohio-4189, 954 N.E.2d 104, ¶ 29. Extrinsic evidence can include “(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to *527 their agreement.” United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr., 129 Ohio App.3d 45, 56, 716 N.E.2d 1201 (2d Dist.1998).
{¶ 10} The certified question asks us to declare, based on the language of the three different royalty clauses in the five leases before us, whether Ohio law imposes the “at-the-well” rule or the “marketable product” rule. The leases at issue were negotiated and signed prior to the culmination of deregulation of the natural gas marketplace by the Federal Energy Regulatory Commission in 1992. See Pipeline Serviced Obligations and Revisions to Regulations Governing Self-Implementing Transportation under Part 284 of the Commission’s Regulations, 57 Fed.Reg. 13,267-02 (1992). The contractual relationship between the lessors and the lessee spans more than four decades. If the language of the leases is ambiguous, we cannot give effect to the parties’ intent, because we do not have extrinsic evidence. If the language of the leases is not ambiguous, then the federal court should be able to interpret the leases without our assistance.
IV. Conclusion
{¶ 11} Under Ohio law, an oil and gas lease is a contract that is subject to the traditional rules of contract construction. Because the rights and remedies of the parties are controlled by the specific language of their lease agreement, we decline to answer the certified question, and dismiss this cause.
Cause dismissed.
O’Connor, C.J., and O’Donnell, Lanzinger, and French, JJ., concur.
Pfeifer, J., dissents, with an opinion.
O’Neill, J., dissents, with an opinion.