RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ZEHENTBAUER FAMILY LAND, LP; HANOVER FARMS, LP; EVELYN FRANCES YOUNG, Successor Trustee of Robert Milton Young Trust,

*Plaintiffs-Appellees*,

*v.*

CHESAPEAKE EXPLORATION, L.L.C.; CHESAPEAKE OPERATING, INC.; CHK UTICA, L.L.C.; TOTAL E&P USA, INC.,

*Defendants-Appellants*.

> No. 18-4139

---

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:15-cv-02449—Benita Y. Pearson, District Judge.

Argued:  June 19, 2019

Decided and Filed:  August 15, 2019

Before:  GILMAN, STRANCH, and NALBANDIAN, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Gregory G. Garre, LATHAM & WATKINS LLP, Washington, D.C., for Appellants.  Dennis E. Murray, Jr., MURRAY & MURRAY, CO., L.P.A., Sandusky, Ohio, for Appellees.  **ON BRIEF:**  Gregory G. Garre, Elana Nightingale Dawson, Samir Deger-Sen, Charles S. Dameron,  LATHAM & WATKINS LLP, Washington, D.C., Daniel T. Donovan, KIRKLAND & ELLIS LLP, Washington, D.C., Timothy B. McGranor, VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, for Appellants.  Dennis E. Murray, Jr., William H. Bartle, MURRAY & MURRAY, CO., L.P.A., Sandusky, Ohio, Scott M. Zurakowski, Terry A. Moore, Gregory W. Watts, KRUGLIAK, WILKINS, GRIFFITHS & DOUGHERTY CO., L.P.A., Canton, Ohio, for Appellees.  L. Bradfield Hughes, PORTER WRIGHT MORRIS & ARTHUR LLP, Columbus, Ohio, Andrew J. Pincus, MAYER BROWN LLP, Washington, D.C., for Amici Curiae.

————————————

**OPINION**

————————————

RONALD LEE GILMAN, Circuit Judge.   This appeal concerns oil and gas leases in Ohio's Utica Shale Formation.  The defendants are exploration and production companies that have contracted with landowners to drill for oil and gas on the leased properties, and the plaintiffs are a putative class of such landowners.  Between 2010 and 2012, the plaintiffs and the defendants entered into hundreds of oil and gas lease agreements that provide for royalty payments to the plaintiffs based on the gross proceeds received by the defendants from the sale of each well's oil and gas production.

The defendants sell the oil and gas extracted from the leased properties to so-called midstream companies affiliated with the defendants.  To calculate the price that an *unaffiliated* entity would have presumptively paid for the oil and gas, the defendants use the "netback method."  According to the plaintiffs, the defendants underpaid the royalties due to the plaintiffs during the years in question because the netback method (1) does not accurately approximate an arm's-length-transaction price, and (2) improperly deducts post-production costs from the price.

The district court granted class certification.  In this interlocutory appeal, the defendants argue that class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure is improper because issues common to the class members do not predominate over individual issues.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I.  BACKGROUND**

**A.  Factual background**

Chesapeake Exploration, LLC, and a predecessor company, Ohio Buckeye Energy, LLC, entered into hundreds of oil and gas leases with landowners in Ohio, including the three named plaintiffs in the present case.  These leases establish that Chesapeake Exploration and its assigns are entitled to produce oil and gas from beneath the surface of the landowners' properties in exchange for royalty payments based on the gross proceeds received from the oil and gas sold.

The plaintiffs have split the leases into three subclasses. Group A's royalty provisions contain language governing the sale price and royalty percentage, but the gas royalty provisions contain a definitional clause and a comparable-sales requirement that the oil royalty provisions do not. The definitional clause outlines the substances governed by the provision and the comparable-sales requirement governs gas sales to companies affiliated with the defendants. Zehentbauer Family Land, LP, and Hanover Farms, LP—two of the three named plaintiffs—are in the Group A subclass.

Group B's royalty provisions contain a definitional clause and comparable-sales requirement for both oil and gas sales. Evelyn Frances Young, Successor Trustee of the Robert Milton Young Trust—the third named plaintiff—is in the Group B subclass.

Finally, all of Group C's oil and gas royalty provisions have a definitional clause, but do not have a comparable-sales requirement. None of the named plaintiffs, however, are in the Group C subclass.

The lease agreements provide that Zehentbauer and Hanover are entitled to a 17.5% royalty and that Young is entitled to a 20% royalty "based upon the gross proceeds paid to Lessee" from the sale of oil or gas sold from the leased premises. The leases define the term "gross proceeds" as "the total consideration paid for oil, gas, associated hydrocarbons, and marketable by-products produced from the leased premises."

For gas sales, the leases specify that the royalties are based on the gross proceeds paid to the defendants "computed at the wellhead." Royalties are based on the defendants' sales price when they sell gas "in an arms-length transaction to an unaffiliated *bona fide* purchaser." The comparable-sales requirement of the leases accounts for the possibility that the defendants might sell gas to their own affiliates. In such cases, the Zehentbauer and Hanover leases provide that

> the price upon which royalties are based shall be comparable to that which could be obtained in an arms length transaction (given the quantity and quality of the gas available for sale from the leased premises and for a similar contract term) and without any deductions or expenses except for Lessee to deduct from Lessor's royalty payments Lessor's prorated share of any tax, severance or otherwise, imposed by any government body.

The Young lease has a nearly identical provision, but its exception for deducting the plaintiffs' share of taxes is incorporated in the sentence following the phrase "and without any deductions or expenses."

For oil sales, the Young lease uses virtually the same royalty language, but omits the phrase "at the wellhead." The Zehentbauer and Hanover leases, however, provide for the calculation of oil royalties based on "the purchase price received for oil prevailing on the date such oil is run into transporter trucks or pipelines."

Following the execution of these leases, Chesapeake Exploration assigned some of its rights under the leases to CHK Utica, LCC, and to Total E&P USA, Inc., both of which are defendants in the present case. CHK Utika is an affiliate of Chesapeake Exploration.

As permitted by the leases, the defendants sell the extracted oil and gas to their affiliates. Chesapeake Exploration and CHK Utica sell the oil and gas to an affiliated company called Chesapeake Energy Marketing, LLC. Total E&P USA sells the oil and gas to a corporate affiliate called Total Gas & Power North America, Inc. These affiliates are midstream companies that buy raw oil and gas at the wellhead and then process the raw products, transport them, and sell them to unaffiliated downstream companies that in turn sell the refined oil and gas products to consumers.

Because the defendants sell the extracted oil and gas to affiliates, the royalty payments are governed by the lease provisions specifying that such payments are to be based on the prices that an unaffiliated entity would have paid for the oil and gas in an arm's-length transaction. (The defendants appear to employ the same method when calculating Group A's oil royalties, despite the lack of comparable-sales language in the governing provision.) In order to determine the arm's-length-transaction price, the defendants and their midstream affiliates employ the "netback method." That method takes a weighted average of prices at which the midstream affiliates sell the oil and gas at various downstream locations and adjusts for the midstream company's costs of compression, dehydration, treating, gathering, processing, fractionation, and transportation to move the raw oil and gas from the wellhead to downstream resale locations.

These costs are referred to as post-production costs. The netback method is intended to account for the midstream costs associated with moving the raw oil and gas from the wellhead to the downstream markets. Because the refined products that the midstream companies sell downstream are chemically distinct from the raw products extracted at the wellhead, and because the midstream products are closer to downstream markets, they are worth more than the raw upstream products.

The midstream affiliates pay the reduced price calculated by the netback method to the upstream producers. Based on these prices, Chesapeake Operating, LLC, makes royalty payments to the plaintiffs on behalf of Chesapeake Exploration, CHK Utica, and Total E&P USA. The plaintiffs receive royalty checks and statements showing the prices, based on the netback method, at which the oil and gas would have purportedly been sold in arm's-length transactions at the wellhead. These royalty statements consistently reflect zero dollars in deductions.

## B. Procedural background

In October 2015, the named plaintiffs sued the defendants in Ohio state court, seeking relief on behalf of themselves and a putative class consisting of "[a]ll persons entitled to royalty payments" from the defendants under what the plaintiffs called "uniform oil and gas leases, known generally as Gross Royalty Leases." The plaintiffs identified 224 putative class members with interests in 295 leases with the defendants.

In the complaint, the plaintiffs allege that the defendants are "failing to pay the full royalties due under the leases." They further assert that the defendants "calculat[e] the royalty payments using a price for oil and gas determined by a less than arms-length transaction" and that the defendants "systematically sell[] Oil and Gas to affiliated entities at below-market prices, and also pass[] improper and/or excessive production and/or post-production expenses to the lessors." Finally, the plaintiffs allege that they are qualified to represent a putative class of similarly situated landowners who have leased their oil and gas rights to the defendants because, among other things, the case would concern the common questions of "whether the Oil and Gas prices used by Defendants to calculate the Plaintiffs' royalties were less than the prevailing

market values for those products" and "[w]hether the various types of post-production costs, expenses, or fees that were charged, directly or indirectly, by Defendants to Plaintiffs and the Class members breached the express and/or implied provisions of the Gross Royalty Leases."

The defendants removed the case to the United States District Court for the Northern District of Ohio. Thereafter, the plaintiffs moved to certify the putative class under Rule 23(b)(3) of the Federal Rules of Civil Procedure. They argued in their motion that all members of the putative class have been "identically affected" by the defendants' conduct. Specifically, they contended that all putative class members were equivalently affected by the fact that the defendants had improperly taken "deductions and expenses from the Plaintiffs' royalties" by using "the netback method to adjust for pro rata postproduction expenses." In other words, the plaintiffs argued that the only question necessary to determine the defendants' liability was the common question of whether the netback method violated the leases.

The district court granted the plaintiffs' motion for class certification regarding the Group A and Group B subclasses. Because none of the named plaintiffs are in Group C, the court concluded that the plaintiffs had failed to establish "typicality" under Rule 23(a)(3) with respect to the Group C subclass and therefore denied the motion with respect to Group C.

The district court agreed with the plaintiffs that "the issue of the propriety of the 'netback' method is the central issue in this case," and that "[t]he answer to that question will resolve the claims of each and every individual in the class." Although the court acknowledged that individual issues governing the market prices of oil and gas at the wellhead were relevant, it ultimately concluded that analyzing those issues would become necessary only for calculating the plaintiffs' damages and therefore did not preclude class certification. The defendants responded by seeking leave to appeal the district court's class-certification order under Rule 23(f) of the Federal Rules of Civil Procedure, which leave was granted by a prior panel of this court.

## II. ANALYSIS

### A. Standard of review

We review a district court's class-certification decision under the abuse-of-discretion standard. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012)). "We will reverse the class certification decision . . . only if [the defendants] make[] a strong showing that the district court's decision amounted to a clear abuse of discretion." *Id.*

### B. Class-certification requirements

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "In order to justify a departure from that rule, 'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'" *Id.* at 348–49 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). A putative class must also comply with Rule 23(a) of the Federal Rules of Civil Procedure, which has "four requirements—numerosity, commonality, typicality, and adequate representation—[that] effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Id.* at 349 (citations and internal quotation marks omitted).

In addition to the four requirements of Rule 23(a), the putative class must satisfy at least one of the requirements of Rule 23(b). The district court certified the class under Rule 23(b)(3) in the present case. A court may certify a class under Rule 23(b)(3) only if it "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are often distilled down to the terms "predominance" and "superiority."

Rule 23(b)(3) is "[f]ramed for situations in which class-action treatment is not as clearly called for as it is in Rule 23(b)(1) and (b)(2) situations." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citation and internal quotation marks omitted). Courts therefore have a "duty to take a '"close look"'" at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (quoting *Amchem*, 521 U.S. at 615). "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Amchem*, 521 U.S. at 609. And the Supreme Court in *Comcast* similarly noted that "[t]he same analytical principles govern Rule 23(b) [and Rule 23(a)]," but "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." 569 U.S. at 34. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (ellipsis and emphasis in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

"[I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Comcast*, 569 U.S. at 33 (citations and internal quotation marks omitted). In addition, "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* (citations and internal quotation marks omitted). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" *Id.* at 33–34 (quoting *Wal-Mart*, 564 U.S. at 351). "That is so because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 34 (quoting *Wal-Mart*, 564 U.S. at 351). This rigorous analysis is not, however, a "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## C. Ohio's oil and gas law

The plaintiffs' claim that the defendants are improperly transferring the burden of paying for post-production costs is part of a broader debate about how oil and gas royalties should be calculated. Until the 1960s, the law uniformly applied the "at-the-well rule," meaning that "oil and gas leases that are either silent on the point at which royalty calculations are to occur, or provide for royalties 'at the wellhead,' authorize lessees to apportion post-production costs in determining the value of the lessor's royalty." Peter A. Lusenhop & John K. Keller, *Deduction of Post-Production Costs—An Analysis of Royalty Calculation Issues Across the Appalachian Basin*, 36 Energy & Min. L. Inst. 837, 840–41 (2015). A majority of states where oil and gas are produced still use the at-the-well rule. *Id.* at 840.

But critics of the at-the-well rule argue that it is "inherently unfair to lessors who lack the necessary expertise to negotiate clauses to protect their interests" and that it therefore gives "the lessee (which is in the best position to control post-production costs) a windfall." *Id.* at 849. Partially in response to this criticism, "[b]eginning around 1960, a number of courts have held the lessee alone responsible for costs incurred up to the place of sale of minerals produced by the lessee or to the point at which a 'marketable product' has been obtained by the lessee." 3 Williams & Meyers, Oil and Gas Law § 645 (2018). The Kansas Supreme Court, for example, invoked traditional duties of oil and gas producers to hold that "[t]he lessee has the duty to produce a marketable product, and the lessee alone bears the expense in making the product marketable." *Sternberger v. Marathon Oil Co.*, 894 P.2d 788, 799 (Kan. 1995). This default rule is known as the "marketable-product rule," and it has also been adopted by Colorado, Oklahoma, Virginia, and West Virginia. Lusenhop & Keller, *supra*, at 850–51.

If the at-the-well rule applies, then a producer may deduct post-production costs before calculating a lessor's royalties, even if the contract provides that the royalties are to be calculated based on "gross" proceeds and "without deductions." *EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, 768 F. App'x 459, 466 (6th Cir. 2019) (applying the at-the-well rule under Kentucky law). By contrast, if the marketable-product rule applies, then most post-production costs "are not

deductible even where . . . the royalty is to be paid based on [the] market price at the mouth of the well." *Sternberger*, 894 P.2d at 799.

Ohio has not adopted either default rule. *See Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1013 (Ohio 2016). In 2015, an Ohio district court certified to the Ohio Supreme Court the question "whether Ohio law imposes the 'at-the-well' rule or the 'marketable product' rule." *Id.* at 1012. The Ohio Supreme Court declined to apply either rule, holding instead that, "[u]nder Ohio law, an oil and gas lease is a contract that is subject to the traditional rules of contract construction." *Id.* at 1013. If the lease language is unambiguous, then courts should interpret the lease "so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Id.* at 1012 (quoting *Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374, 376 (Ohio 1974)). And "when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning," then courts should consider "[e]xtrinsic evidence . . . to ascertain the intent of the parties." *Id.* (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)).

The defendants in the present case have been calculating royalties as though the leases incorporate the at-the-well rule. If they are correct, and if the parties always intended the royalties to be calculated based on the wellhead prices, then applying the marketable-product rule "runs the risk of giving [the plaintiffs] the benefit of a bargain not made." *See id.* at 1014 (O'Neill, J., dissenting). But if they are incorrect, then the plaintiffs have been systematically undercompensated for the oil and gas removed from their land. Both sides argue that the leases expressly require their own respective royalty-calculation method.

**D. Because the plaintiffs no longer argue that the defendants breached the leases by selling oil and gas to the defendants' midstream affiliates at below-market prices, class certification is appropriate.**

The defendants argue that the district court improperly certified the class because the plaintiffs failed to establish predominance under Rule 23(b)(3) of the Federal Rules of Civil Procedure. They argue that the plaintiffs' allegation that the defendants used a uniform practice of calculating royalties—the netback method—is insufficient to show predominance. Specifically, the defendants argue that common issues do not predominate because the plaintiffs'

claims rely on showing that the defendants' royalty payments were based on sale prices that fell below what an unaffiliated company would have paid for the oil and gas at the wellhead. The defendants contend that proving liability on this theory requires estimating the market prices for the raw oil and gas produced at each wellhead and comparing these estimated market prices to the prices calculated using the netback method. According to the defendants, the inquiry to determine these market prices is highly individualized because the market prices depend on the quality of the oil and gas sold at each well, the quantity of the oil and gas so sold, and the proximity of the well to processing facilities and downstream markets.

The district court, however, agreed with the plaintiffs' argument that the key question for the purposes of Rule 23(a)(2) commonality is "whether Defendants' use of the 'netback method' of royalty calculation is consistent with the language of the leases." In response to the defendants' argument that such an inquiry presents individual issues that prevent a finding of commonality, the court noted that analyzing these individual issues "would only become necessary for damages calculations and Rule 23 does not require the Court to determine damages on a classwide basis." The court then addressed the same argument in its discussion of predominance under Rule 23(b)(3), concluding that the "Plaintiffs' theory of liability does not require a specific valuation of the products produced at each well." It concluded that "the issue of the propriety of the 'netback' method is the central issue in this case" and that "[t]he answer to that question will resolve the claims of each and every individual in the class."

We agree with the defendants' argument that the plaintiffs have not met their burden of showing that common issues predominate with respect to the plaintiffs' theory that the defendants sold oil and gas to midstream affiliates at below-market prices. But the defendants' argument ultimately fails because the plaintiffs no longer pursue at the class-certification stage the theory that the defendants breached the leases by selling oil and gas at below-market prices at each wellhead. And the plaintiffs stipulated during oral argument and asserted in their brief that they are willing to proceed solely on their post-production-costs theory of liability.

**E. The plaintiffs satisfy the requirements of Rule 23(b)(3) with their liability theory based on the defendants' deductions of post-production costs.**

We will now address the sole theory of liability that the plaintiffs argue at the class-certification stage. The plaintiffs argue that the netback method breached the leases because the defendants improperly deducted post-production costs, in violation of the lease language prohibiting the defendants from deducting any expenses other than the plaintiffs' share of taxes.

We conclude that the plaintiffs satisfy the predominance requirement of Rule 23(b)(3) under this theory of the case. Under this theory, liability is based on the question of whether the lease language permits the defendants to deduct post-production costs in calculating the plaintiffs' royalty payments. In other words, the case will turn on whether the lease language is deemed to invoke the at-the-well rule, the marketable-product rule, or a different valuation system entirely. This question will have a common answer that turns on the court's interpretation of the lease language under Ohio law. *See* 1 McLaughlin on Class Actions § 5:56 (15th ed. 2018) ("Breach of contract claims arising out of a standardized, form contract ordinarily are suitable for class certification . . . ."); *see also Smilow v. Sw. Bell Mobile Sys.*, 323 F.3d 32, 42 (1st Cir. 2003) (finding predominance satisfied because "[t]he case turns on interpretation of the form contract, executed by all class members and defendant").

If the plaintiffs prevail in showing that the defendants' uniform practice of deducting post-production costs to calculate royalties breached the leases, then the plaintiffs will have succeeded in proving liability. And conversely, if the defendants' method of calculating royalty payments by deducting post-production costs did not breach the leases, then all of the plaintiffs' claims will fail on the merits. This theory of liability, moreover, does not require an estimation of the individual market prices of oil and gas at each well. Liability will turn solely on whether the leases permit the defendants to deduct post-production costs in calculating the royalties due to the plaintiffs (like the at-the-well rule), or whether the leases prohibit the defendants from deducting post-production costs (like the marketable-product rule). And if the plaintiffs prevail on the merits, then damages will be calculated by estimating what the royalty payments would have been if the defendants had not deducted post-production costs using the netback method.

This will be done without regard to the individual market prices of oil and gas at each well. (*See* Part II.G. below.)

We therefore conclude that the common question of whether the defendants breached the leases by employing the netback method predominates over individual questions. The defendants, however, challenge this post-production-costs theory of the case on two grounds. First, they argue that it is inconsistent with the pleadings. The pleadings, according to the defendants, primarily focused on the theory that the netback method violated the leases because it yielded royalties based on below-market prices at the wellhead. Second, the defendants argue that the plaintiffs' post-production-costs theory has no merit. We will address each argument in turn.

Per the defendants' first argument, they contend that the plaintiffs are now asserting a theory of liability based on the defendants' deduction of post-production costs that is inconsistent with the plaintiffs' complaint. The defendants accuse the plaintiffs of "present[ing] a plausible breach-of-contract theory that would survive an initial motion to dismiss," and then changing course by "advanc[ing] a different, implausible theory of breach that would propel a motion for class certification."

But scrutiny of the complaint reveals that the plaintiffs asserted both theories of liability at the pleading stage. The plaintiffs alleged in the complaint that the "Defendants breached their lease duties by systematically selling Oil and Gas to affiliated entities at below-market prices, *and also passed improper and/or excessive production and/or post-production expenses to the [plaintiffs]*, plainly violating the leases." (Emphasis added.) In addition, the plaintiffs assert throughout the complaint that the defendants acted improperly by deducting post-production costs. We are therefore not persuaded by the defendants' argument that the plaintiffs presented one theory of the case to survive a motion to dismiss and then pivoted to another theory of the case to survive class certification. Instead, the plaintiffs have pleaded that the defendants' use of the netback method has violated the leases under both theories.

The complaint thus refutes the defendants' argument that, had they known that the plaintiffs' claims relied on the theory that the defendants improperly deducted post-production

costs, then the defendants would have raised such an argument in a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Because this theory is, in fact, clearly set forth in the complaint, the defendants could have timely filed such a 12(b)(6) motion.  We further note that the defendants can still pursue their argument that deducting post-production costs does not violate the leases by filing a motion for judgment on the pleadings under Rule 12(c) or a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

The defendants next argue that deducting post-production costs is fully consistent with the leases.  According to the defendants, the leases make clear that the gas royalty payments are based on "gross proceeds paid to the Lessee" and "computed at the wellhead."  They therefore argue that the gas royalty payments should be based on the defendants' sales to midstream companies at the wellhead, not on the sales from midstream companies to downstream companies.  The netback method, the defendants argue, deducts post-production costs from the downstream prices in order to approximate what an unaffiliated company would have paid the defendants for the raw products produced at the wellhead.  This argument, however, is merits-based and thus prematurely presented at the class-certification stage of the case.

The defendants counter by pointing out that the Supreme Court in *Comcast* noted that courts are sometimes required to look at the merits in deciding a motion for class certification. *Comcast* held that "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citations and internal quotation marks omitted).  "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim.  That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Id.* at 33–34 (citations and internal quotation marks omitted).

But the Supreme Court in *Comcast* authorized lower courts to look at the merits during the class-certification stage only insofar as doing so is necessary to determine "whether common questions predominate over individual ones."  *Id.* at 34; *see also Amgen Inc. v. Conn. Ret. Plans*

*& Tr. Funds*, 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). The defendants' argument challenging the plaintiffs' post-production-costs theory is a merits argument that is not germane to the predominance requirement of Rule 23(b)(3), so we decline to engage with it at the present time.

**F. The cases cited by the defendants in which other circuits vacated class certification to plaintiffs challenging oil and gas royalty payments are inapposite.**

We will now address the defendants' argument that caselaw from other circuits supports vacating the district court's order certifying the class in the present case. The defendants specifically point to two oil-and-gas-royalty cases from other circuits in which the court of appeals vacated a district court's class-certification order. One of these cases is *EQT Production Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014), where the Fourth Circuit vacated the district court's order certifying a class of plaintiffs who argued that the defendants underpaid their royalties for coalbed methane. The other case is *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213 (10th Cir. 2013), where the Tenth Circuit similarly vacated the district court's order certifying a class of plaintiffs challenging the defendant's use of the netback method in paying gas royalties. Although these two cases share a number of factual similarities with the present case, each has a material distinguishing feature.

We turn first to *EQT Production Co.*, where five subclasses of plaintiffs argued that the defendants underpaid their gas royalties. All five subclasses contended that "the defendants sold the [coalbed methane] at too low a price, in part, by selling the gas to affiliates in non-arms-length transactions." *EQT*, 764 F.3d at 365. The district court believed that commonality and predominance were satisfied because "the defendants employed numerous uniform practices related to the calculation and payment of [coalbed methane] royalties." *Id.* at 366.

Although the Fourth Circuit noted that these common practices were relevant to the predominance inquiry, it held "that the district court abused its discretion by failing to consider the significance of this common conduct to the broader litigation." *Id.* The Fourth Circuit also

held that "the mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement." *Id.* Ultimately, the Fourth Circuit vacated the district court's order because it believed that "the district court placed an inordinate emphasis on the sheer number of uniform practices without considering whether those practices are relevant to assessing the defendants' ultimate liability." *Id.*

No such error was committed in the present case because the district court's focus was not "only on the number of common practices." *See id.* at 367. Rather, it determined that a common question predominates because the plaintiffs' case turns on the propriety of the netback method under the uniform contract language, and it found both commonality and predominance on that basis. Importantly, the Fourth Circuit explained that certification might be proper if the plaintiffs were "able to identify a finite number of variations in deed language, such that the ownership question is answerable on a subclass basis." *Id.* at 363. That is precisely what the district court did here.

*Roderick* is also distinguishable. In *Roderick*, the plaintiffs argued that XTO Energy "systematically underpaid royalties by deducting costs associated with placing gas (and its constituent products) in marketable condition," in violation of Kansas's marketable-product rule. 725 F.3d at 1216. As in the present case, the plaintiffs in *Roderick* argued that the defendant used the netback method to calculate royalties, thereby improperly deducting post-production costs. *Id.* The district court certified the class based on the common question of whether XTO's payment methodology breached Kansas's implied duty of marketability for lessees. *Id.* at 1217.

But the Tenth Circuit vacated the district court's class-certification order because the plaintiffs failed to demonstrate commonality with respect to whether the leases abrogated Kansas's default marketable-product rule. *Id.* at 1218. Specifically, because the lease language varied from lease to lease, the Tenth Circuit concluded that the plaintiffs failed to meet their burden of affirmatively demonstrating commonality based on the marketable-product rule. *Id.* It also agreed with the defendant that the issue of when the gas becomes marketable might require an individualized analysis of each well. *Id.* at 1219. This distinction between wells was

material because if the gas was already marketable at a particular well, then deductions for post-production costs for that well would not constitute a breach of the implied duty of marketability. *Id.*

*Roderick* is distinguishable because the district court in the present case found that the leases at issue do not have any material differences in the lease language. As the Tenth Circuit subsequently explained, *Roderick*'s concern about varying lease language is not implicated if the plaintiffs are able to "'categorize[]' the leases at issue 'by royalty[-]clause language.'" *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 795 (10th Cir. 2019) (second alternation in original). The plaintiffs did so in this case by identifying two subclasses within which all subclass members signed materially identical oil and gas royalty provisions. And the defendants do not argue on appeal that any differences that do exist in the lease language defeat commonality or predominance. Furthermore, the defendants here do not argue that any of the wells in question produce oil or gas that is already in marketable condition, nor do they even assert that marketability is a relevant inquiry. We therefore conclude that the commonality problem in *Roderick* is not present here.

## G. The district court must ensure that, if the plaintiffs prevail on the merits, any damages calculations match the sole remaining theory of liability.

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), held that class certification is not proper where a "model fail[s] to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised." *Id.* at 36. In other words, "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Id.* at 35 (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)). We have applied *Comcast* outside the context of antitrust cases. *See, e.g.*, *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 523–24 (6th Cir. 2015) (performing a *Comcast* analysis in a class action where the plaintiffs argued that nutritional supplements did not work as advertised).

In its class-certification order, the district court noted that "[a]n analysis of the[] physical differences [between wells] would only become necessary for damages calculations." But no

such analysis of the physical differences between wells will be necessary at the damages stage of the litigation under the plaintiffs' sole remaining theory of liability, *i.e.*, that the defendants improperly deducted post-production costs. Should the plaintiffs prevail in establishing that the defendants breached the leases by deducting post-production costs, then the plaintiffs' damages model must calculate what the royalty payments would have been had the defendants not deducted these costs in the royalty-payment calculations. This method will, in effect, base royalty payments solely on the prices at which the defendants' midstream affiliates sold oil and gas to downstream companies. Damages will then equal the difference between the royalty payments based on the downstream prices and the actual royalty payments calculated using the netback method, the latter having deducted post-production costs. This damages model is consistent with the plaintiffs' theory of liability.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.