NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0059n.06

No. 20-3469

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

ZEHENTBAUER FAMILY LAND, LP;
HANOVER FARMS, LP; EVELYN FRANCES
YOUNG, Successor Trustee of Robert Milton Young
Trust,

  Plaintiffs-Appellants,

v.

TOTALENERGIES E&P USA, INC., fka Total E&P
USA, Inc.; PELICAN ENERGY, LLC;
JAMESTOWN RESOURCES, LLC,

  Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Feb 01, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

Before: SUHRHEINRICH, STRANCH, and MURPHY, Circuit Judges.

SUHRHEINRICH, Circuit Judge. Plaintiffs, a class of landowners in Ohio's Utica Shale Formation, claim that Defendants, oil-and-gas exploration companies, miscalculated their royalty payments by basing them on the "at the wellhead" price rather than on the downstream value of refined oil and gas products. The district court sided with Defendants and so must we.

## I.

Plaintiffs entered into oil and gas lease agreements with a predecessor of Defendants between 2010 and 2012. *See Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 499–501 (6th Cir. 2019). These agreements allow the defendant production companies to extract oil and gas from the landowners' properties; in exchange, the landowners receive royalty

payments "based upon the gross proceeds paid to Lessee for the gas marketed and used off the leased premises, including casinghead gas or other gaseous substance . . . *computed at the wellhead* from the sale of such gas substances so sold by Lessee." R. 1-1, PID 46 ¶ 5(b) (emphasis added). "Gross proceeds" are defined as "the total consideration paid for oil, gas, associated hydrocarbons, and marketable by-products produced from the leased premises." *Id.* And gross proceeds are derived from sales either to (1) an unaffiliated *bona fide* purchaser in an "arms-length transaction," or (2) an "affiliate of Lessee," for a comparable sales price "and without any deductions or expenses." *Id.*

Defendants Chesapeake Exploration, LLC and CHK Utica, LLC (collectively "Chesapeake") sell their oil and gas at the wellhead to midstream affiliate Chesapeake Energy Marketing, LLC ("CEMLLC").[1] *See* R. 114-1, PID 3724. Defendant TotalEnergies E&P USA, Inc. ("Total")[2] sells its oil and gas at the wellhead to midstream affiliate Total Gas & Power North America, Inc. ("TGPNA"). *See* R. 112-1, PID 3606. CEMLLC and TGPNA process the raw products and transport them for sale to unaffiliated downstream companies. *Zehentbauer*, 935 F.3d at 501. These midstream affiliates pay for the gas using the netback method, which "takes a weighted average of prices at which the midstream affiliates sell the oil and gas at various downstream locations and adjusts for the midstream company's costs of compression, dehydration, treating, gathering, processing, fractionation, and transportation to move the raw oil and gas from the wellhead to downstream resale locations." *Id.* The netback method accounts for these midstream, or post-production, costs. *Id.* The midstream affiliates pay this reduced amount to the

---

[1] Chesapeake Exploration or CHK Utica, LLC is the named lessee or the successor in interests in the leases. R. 92, PID 1020 ¶ 4. Total, Jamestown Resources, LLC, and Pelican Energy LLC own working interests in Plaintiffs' leases. *Id.* at 1020 ¶ 5; *see also* R. 109-1, PID 3540–41, ¶¶ 26-27.

[2] Chesapeake assigned some of its rights as lessee to Total. Total has a working interest in many of the leases at issue. Appellees' Br. at 10–11.

defendant producers, who use this netback price as the base for calculating Plaintiffs' royalty payments. *Id.*

Plaintiffs felt that their royalties should be based on a different set of gross proceeds—the gross proceeds received by affiliates of Defendants further downstream after the product is refined and moved to market. In 2015 they sued Defendant Lessees on behalf of themselves and 224 other lessors complaining that Defendants had breached their lease obligations by "failing to pay the full royalties due under the leases" to the class members. R. 1-1, PID 36 ¶ 85.

The district court granted summary judgment to Defendants, holding that the plain and unambiguous language of the contract required that the "royalties are to be valued based on the wellhead value of the oil, gas, and [natural gas liquids] and, therefore, the deduction of post-production costs are authorized." *Zehentbauer Fam. Land LP v. Chesapeake Expl., LLC*, 450 F. Supp. 3d 790, 811 (N.D. Ohio 2020).

Plaintiffs appealed. Plaintiffs and the Chesapeake Defendants jointly moved to dismiss the case as to those defendants only, *see* ECF No. 43, which the Clerk of Court granted, ECF No. 46. The remaining defendants on appeal are Total, Jamestown Resources, LLC, and Pelican Energy, LLC.

## II.

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's grant of summary judgment de novo. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

The parties agree that Ohio law applies. R. 92, PID 1021. In Ohio, an oil and gas lease is a contract governed by "the traditional rules of contract construction." *Lutz v. Chesapeake*

*Appalachia, LLC*, 71 N.E.3d 1010, 1011 (Ohio 2016); *see Henceroth v. Chesapeake Expl., LLC*, 814 F. App'x 67, 69 (6th Cir. 2020). "If the lease language is unambiguous, then courts should interpret the lease 'so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.'" *Zehentbauer*, 935 F.3d at 505 (quoting *Lutz*, 71 N.E.3d at 1012). Defendants' royalty calculations follow the lease language. Defendants sell oil and gas at the well to their affiliates, CEMLLC and TGPNA, and calculate the landowners' royalty payments based on the amount received from those sales. *Cf. Henceroth*, 814 F. App'x at 69.

This conclusion follows from a textual analysis. The leases provide that gas royalties[3] are calculated "based upon the gross proceeds *paid to Lessee* for the gas marketed and used off the leased premises . . . computed at the wellhead from the sale of such gas substance so sold by Lessee." R. 1-1, PID 46 ¶ 5(b) (emphasis added). Thus, the royalty calculation is based on (1) the "gross" (or total) proceeds, (2) "paid to Lessee[s]", *i.e.*, Defendants themselves; (3) on gas marketed, *i.e.*, sold, *see id.* at 71; (5) at the wellhead, *see id.* (noting that "[t]he key language is 'produced and marketed from the Leasehold,' and it shows that the first sale price is the proper royalty base"); (6) using the netback method, *see id.* at 70 (stating that "[i]t is standard practice in the industry to calculate the wellhead sales price using the netback method and to use the netback price to calculate landowners' royalties"). Thus, Plaintiffs' royalties are based on the wellhead value of the gas sold. In fact, there's no deduction at all. Stated differently, though the Lessees are receiving an amount that is "net" as to the downstream affiliate, it is *not* "net" from the Lessees' perspective, but simply the actual cost of the raw product produced by the Lessee production company without any deductions (production or post-production) *by the Lessee* for its production

---

[3] Plaintiffs do not develop a distinct argument for the oil leases, so we treat them similarly. In any event, the oil leases provide that Defendants pay royalties on the gross proceeds "from the sale of oil recovered from the leased premises" near the wellhead, where the "oil is run into transporter trucks or pipelines." R. 1-1, PID 46 ¶ 5(a).

costs. *See id.* And Plaintiffs' royalties are based on those gross proceeds paid to the Lessee. This reading not only squares with the "without any deductions or expenses" language in the affiliate clause, but it also reaches a fair result by "avoid[ing] a windfall to landowners." *See id.*; *see also Schroeder v. Terra Energy, Ltd.*, 565 N.W.2d 887, 894 (Mich. Ct. App. 1997).

Plaintiffs' arguments for a different reading of the leases fail.[4] First, defining "gross proceeds" as including "*marketable* by-products" does not require that the royalties be based on downstream sales of *finished* by-products. A marketable product is one that is "capable of" being marketed; it is not a "finished" by-product. *See -able*, Merriam-Webster.com Dictionary (2021), https://www.merriam-webster.com/dictionary/able. Instead, the leases require that Plaintiffs receive royalties on the sale of *all* products *and* by-products that are capable of being marketed, *i.e.*, sold. *See Henceroth*, 814 F. App'x at 71.

Second, Plaintiffs' suggestion that the phrase "at the wellhead" refers to "volume" or "amount" and modifies the words "gas marketed and used" instead of "gross proceeds" doesn't work either because the terms "volume" or "amount" do not appear in the royalty clauses. To read them in would be to rewrite the contract, something courts are not authorized to do. *See Porter v. Columbus Bd. of Indus. Rels.*, 675 N.E.2d 1329, 1331 (Ohio Ct. App. 1996). The omission of the "at the wellhead" verbiage from the oil leases is understandable because oil is not measured at the wellhead but stored in tanks and transported by trucks. Thus, the valuation point for the oil royalty calculation is "based upon the gross proceeds paid to Lessee from the sale of oil recovered from the leased premises valued at the purchase price received for oil prevailing on the date such oil is run into transporter trucks or pipelines." R. 1-1, PID 46 ¶ 5(a). Our reading of "at the wellhead"

---

[4] Plaintiffs' assertion that the district court defaulted to the "at the well" rule deserves little comment. The court held that the contract language reflected the parties' intent to adopt that rule. *Zehentbauer*, 450 F. Supp. 3d at 805–09, 811. Thus, the court did precisely what Ohio law requires—it looked to the lease language to ascertain the parties' intent. *See Lutz*, 71 N.E.3d at 1012.

fills another hole in Plaintiffs' argument—it provides a valuation point. Because gas is processed at various downstream sales points, R. 109-1, PID 3541 ¶ 28, it would be difficult to set a valuation point for the gas royalty calculation under Plaintiffs' reading of the leases.

Third, even if, as Plaintiffs say, "computed at the wellhead" modifies "gas marketed and used off the leased premises," it also necessarily modifies "gross proceeds" because "gas marketed and used" modifies "gross proceeds." The district court read the phrase in a similar way: "[T]he words 'computed at the wellhead' appear in the sentence 'computed at the wellhead *from the sale* of such gas substances so sold by Lessee[.]' What is 'computed . . . from the sale' must be the proceeds of those sales." *Zehentbauer*, 450 F. Supp. 3d at 809 (first alteration added) (emphasis in original) (citations omitted).

Plaintiffs have one case in their camp: *BlueStone Natural Resources II, LLC v. Randle*, 620 S.W.3d 380 (Tex. 2021). There, the Texas Supreme Court held that the phrases "gross proceeds" and "at the wellhead" in a gas lease conflicted because the latter term envisions a net-proceeds calculation. *Id.* at 391. But, as Defendants point out, a critical fact distinguishes *BlueStone* from this case: there the lessor did not actually sell gas until *after* paying to have it processed and then sold to a downstream third party. Thus, under those circumstances, "gross value received" for the refined gas was at the point of sale, which was not "at the wellhead," where the gas was in a raw, less valuable state. *See* Opening Br. on the Merits 21-22, *BlueStone Nat. Res.*, 2021 WL 936175 (Tex. Mar. 12, 2021) (No. 19-0459), 2019 WL 7466291. In this case, the gas was sold at the wellhead, so the "gross value received" by Defendants was the wellhead price.

## III.

We affirm the judgment of the district court.