RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0225p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────────

IN RE: FIRSTENERGY CORPORATION SECURITIES
LITIGATION.

───────────────────────────────────────────

DIANE OWENS; CHANA FRAND; CALIFORNIA PUBLIC
EMPLOYEES' RETIREMENT SYSTEM; LOS ANGELES COUNTY
EMPLOYEES' RETIREMENT ASSOCIATION; AMALGAMATED
BANK; CITY OF IRVING SUPPLEMENTAL BENEFIT PLAN;
WISCONSIN LABORERS' PENSION FUND,

> Nos. 23-3940 /3943 /3945 /3946 /3947

*Plaintiffs-Appellees*,

*v.*

FIRSTENERGY CORPORATION; STEVEN E. STRAH; K. JON
TAYLOR; JASON LISOWSKI; GEORGE M. SMART; PAUL T.
ADDISON; MICHAEL J. ANDERSON; STEVEN J. DEMETRIOU;
JULIA L. JOHNSON; DONALD T. MISHEFF; THOMAS N.
MITCHELL; JAMES F. O'NEIL, III; CHRISTOPHER D. PAPPAS;
SANDRA PIANALTO; LUIS A. REYES; JERRY SUE
THORNTON; LESLIE M. TURNER (23-3940); JAMES F.
PEARSON (23-3943); CHARLES E. JONES (23-3945);
DONALD SCHNEIDER (23-3946); JOHN JUDGE (23-3947),

*Defendants-Appellants*.

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
Nos. 2:20-cv-03785; 2:20-cv-04287—Algenon L. Marbley, District Judge.

Argued: July 17, 2024

Decided and Filed: August 13, 2025

Before: BOGGS, CLAY, and GIBBONS, Circuit Judges.

———————————

**COUNSEL**

———————————

**ARGUED:** Robert J. Giuffra, Jr., SULLIVAN & CROMWELL LLP, New York, New York, for all Appellants. Jason A. Forge, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California, for Appellees. **ON BRIEF:** Robert J. Giuffra, Jr., Sharon L. Nelles, David M.J. Rein, SULLIVAN & CROMWELL LLP, New York, New York, Morgan L. Ratner, SULLIVAN & CROMWELL LLP, Washington, D.C., for the FirstEnergy Appellants. David L. Axelrod, Timothy D. Katsiff, BALLARD SPAHR LLP, Philadelphia, Pennsylvania, for Appellant James F. Pearson. Jason A. Forge, Joseph D. Daley, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California, Brian K. Murphy, MURRAY MURPHY MOUL + BASIL LLP, Columbus, Ohio, for Appellees. Todd G. Cosenza, Charles D. Cording, Madeleine L. Tayer, Amanda M. Payne, WILLKIE FARR & GALLAGHER LLP, New York, New York, Deanne E. Maynard, MORRISON & FOERSTER LLP, Washington, D.C., Michael D. Risley, Marjorie A. Farris, Chadwick A. McTighe, Bethan A. Breetz, STITES & HARBISON, PLLC, Louisville, Kentucky, for Amici Curiae.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge. In this interlocutory appeal from a district-court order granting class certification under Federal Rule of Civil Procedure 23(b)(3), we are required to grapple with two major issues of securities-fraud law. First, when may a plaintiff class be accorded a presumption of reliance under the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), in a case that alleges both omissions and misrepresentations to argue for liability under section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a–78rr; *id.* § 78j(b), and United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5? And second, under the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), when has a district court conducted a "rigorous analysis" of whether a plaintiff class has established that "damages are susceptible of measurement across the entire class"? For the reasons given in some detail below, we hold that the class certification was defective on both grounds, though perhaps not fatally so, and remand for further consideration under the standards set out in this opinion.

# I. BACKGROUND

We begin by discussing this appeal's background. Our holdings today set forth a framework for a district court's analysis at class certification of the allegations in a proposed class's complaint. Accordingly, to adopt that posture, we list below purely the "facts" as alleged in Plaintiffs' consolidated complaint. These allegations were taken as true and summarized by the district court in its order denying Defendants' motions to dismiss. *In re FirstEnergy Corp.*, Nos. 2:20-cv-3785 & 2:20-cv-4287, 2022 WL 681320 (S.D. Ohio Mar. 7, 2022). This summary was then restated by the district court in its class-certification order. *In re FirstEnergy Corp. Sec. Litig.*, Nos. 2:20-cv-3785 & 2:20-cv-4287, 2023 WL 2709373 (S.D. Ohio Mar. 30, 2023). We borrow extensively from this summary. We then discuss this case's procedural history.

## A. The Arrangement

Between February 21, 2017, and July 21, 2020, "FirstEnergy and its most senior executives bankrolled one of the largest corruption and bribery schemes in U.S. history." Consolidated Compl. ¶ 3 (hereinafter "Compl."). FirstEnergy "paid approximately $60 million to Ohio's former Speaker of the House Larry Householder, the former Chairman of the Public Utilities Commission of Ohio ('PUCO') Sam Randazzo, and others . . . via a web of lobbyists, shell companies, and political action committees." *FirstEnergy*, 2023 WL 2709373, at *2. "In exchange, FirstEnergy received a bailout of its nuclear power plants" through Ohio House Bill 6 ("HB6"), which "delivered approximately $2 billion to FirstEnergy: $1.3 billion in a ratepayer-funded subsidy and $700 million in a 'decoupling' provision that would allow FirstEnergy to charge artificially high rates." *Ibid.* But the plan was revealed in 2020 when Householder and his associates were arrested and charged in connection with the bribery. *Ibid.*; *see also United States v. Householder*, 137 F.4th 454 (6th Cir. 2025) (per curiam).

"HB6 was the culmination of a years-long effort to solve FirstEnergy's nuclear problems." *FirstEnergy*, 2023 WL 2709373, at *3. FirstEnergy's nuclear costs and liabilities had been increasing for years to a forecasted amount of "hundreds of millions of dollars," and this problem came to a head in 2018 when "FirstEnergy announced plans to decommission [its] two nuclear power plants — which would entail billions of dollars in direct expenses and future

environmental liabilities." *Ibid.* To try and shed these costs, the two subsidiaries through which FirstEnergy operated the plants filed for bankruptcy, but the case was halted when the Department of Justice, the Office of the Ohio Consumers' Counsel, and others objected to FirstEnergy's settlement request of an express release of liability for decommissioning expenses. *Ibid.* But meanwhile, for two years FirstEnergy "had been laying the groundwork for [a] backup plan" to delay the decommissioning of the nuclear plants through the passage of HB6. Compl. ¶ 63.

Early in 2017, FirstEnergy began "courting" then-State Representative and Speaker-hopeful Larry Householder by flying him and his sons aboard the corporate jet to President Trump's inauguration. *Id.* ¶ 65. "Shortly thereafter, FirstEnergy established two 501(c)(4) organizations, Partners for Progress and Generation Now, that would serve as the covert vehicles for funneling money to Householder and affiliates." *FirstEnergy*, 2023 WL 2709373, at *3. Through these organizations, "FirstEnergy made sizable contributions to Householder in 2017 and 2018 but concealed the true magnitude of its spending ($2.9 million)." *Ibid.*

"While FirstEnergy was making these clandestine contributions, it allegedly misled its shareholders about the nature of its political activity." *Ibid.* For example, the company issued proxy statements in connection with a May 16, 2017, shareholder meeting "where one item of business was a shareholder proposal to require an annual report on lobbying policies and payments. In urging shareholders to vote against the proposal, FirstEnergy referred shareholders to its Political Activity Policy, which represented that FirstEnergy 'complies with all federal and state lobbying registration and disclosure requirements' and 'has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy.' Additionally, FirstEnergy's filings with the [SEC] disclosed [FirstEnergy's] pursuit of 'legislative or regulatory solutions,' but made no mention of the legal, financial, and reputational risks involved in how [FirstEnergy] was pursuing those solutions." *Ibid.* (citation modified).

"Householder, bolstered by the election of FirstEnergy-funded supporters, became Speaker of the Ohio House of Representatives in January 2019.  Having secured one powerful ally, FirstEnergy expanded its scheme with a $4.3 million payment to incoming PUCO Chairman Sam Randazzo, who in turn helped to write and support HB6.  Householder introduced the bill in April 2019, and it passed the House of Representatives in May.  In these two months alone, FirstEnergy contributed at least $9.5 million to the scheme in concealed payments [to a network of tax-exempt entities connected to Householder and his political allies].  The [Ohio] Senate added the valuable decoupling provision and passed the bill, after FirstEnergy contributed another $7 million."  *Ibid.* (citation modified).

"Ohio Governor Mike De[W]ine signed HB6 into law on July 23, 2019.  Public opposition to HB6 quickly arose in the form of a referendum movement, and the scheme shifted to defending the new law.  FirstEnergy funneled over $38 million [to its payment network] . . . . [and] the funds were spent on an advertising campaign urging Ohioans not to sign the referendum petition — which the groups baselessly linked to the Chinese government — and also to bribe, disrupt, or disqualify signature collectors."  *Ibid.* (citation modified).

"The referendum effort failed[, and,] . . . . buoyed by the concealment of risk and by the seemingly guaranteed revenue from HB6, FirstEnergy stock traded at artificially high prices, and its credit ratings improved with [credit-rating agencies] S&P, Moody's, and Fitch.  FirstEnergy used the inflated prices to issue $2.5 billion in stock and $2.5 billion in debt securities."  *Id.* at *4 (citation modified).  "The scheme crumbled, however, when criminal charges were brought on July 21, 2020, against Householder, his political strategist . . . , three lobbyists . . . , and Generation Now.  The . . . complaint alleged a federal racketeering conspiracy involving honest services wire fraud, receipt of bribes, and money laundering.  The . . . complaint did not identify FirstEnergy by name — it referred to [it] as 'Company A' — but prosecutors announced that 'everyone in this room knows who Company A is.' . . .  FirstEnergy stock plunged almost 35% on July 21 and 22, 2020, representing a loss of over $7.68 billion in market [capitalization].  As further developments about [its] fraudulent conduct became known, FirstEnergy['s market capitalization] fell again: by $1.1 billion on October 29, 2020, and by $1.3 billion between November 19 and 24, 2020.  In each of these windows, the price of [FirstEnergy's] debt

securities declined as well.  By November 2020, the major ratings agencies had downgraded FirstEnergy's credit ratings to 'junk status.'  Investors, including Plaintiffs, lost billions of dollars collectively."  *Ibid.* (citation modified).

Two Defendants "pleaded guilty to the racketeering conspiracy, admitting that they committed criminal acts to conceal the nature and source of payments that were made to Generation Now in return for specific official action by Householder.  Generation Now later followed suit and admitted to receiving money from 'Company A' to be used in return for specific official action by Householder, and to concealing the nature and source of the payments. . . .   FirstEnergy announced the firing of [three Defendants] for having 'violated certain Company policies and its code of conduct.'  Shortly thereafter, FirstEnergy terminated [a fourth Defendant] and another legal officer for 'inaction and conduct that the Board determined was influenced by the improper tone at the top.'"  *Ibid.* (citation modified).

## B.  *The Offerings*

"On March 6, 2018, FirstEnergy filed a shelf registration statement with the SEC . . . through which [it] could make multiple securities offerings.  On February 19, 2020, [it] filed a prospectus supplement . . . . [from which it] in February 2020 registered for issuance of $1.7 billion of FirstEnergy Notes . . . .   On June 4, 2020, [it] filed a second prospectus supplement . . . . [from which it] in June 2020 registered for issuance of $750 million of FirstEnergy Notes . . . ."  *Id.* at *5 (citation modified).  FirstEnergy "successfully solicited investors" for both offerings, which were underwritten by the Underwriter Defendants.  *Ibid.*; *see also* Compl. ¶ 289.

Plaintiffs alleged that these prospectus supplements "contained untrue assertions of material fact and material omissions of fact," as well as that "they were also not prepared in accordance with SEC rules and regulations."  *FirstEnergy*, 2023 WL 2709373, at *5.  Because the supplements "specifically failed to disclose the fraudulent scheme that FirstEnergy was engaged in[,] these undisclosed facts thus exposed FirstEnergy to significant liability and diminished the actual value of the notes sold in the [o]fferings."  *Ibid.*  Plaintiffs claimed that they "sustained damages as the values of the notes issued in the [o]fferings ha[d] declined due to

the revelation of Defendants' wrongful conduct" and "the value of stock fell from the artificially inflated highs at which they were selling due to the misstatements and omissions made by the Defendants." *Ibid.*

## C. The Proceedings Below

"Plaintiff Owens filed her original Complaint on July 28, 2020." *Ibid.* On October 23, 2020, the district court consolidated her case with other related class actions against FirstEnergy. *Ibid.* Plaintiffs' consolidated complaint, filed in February 2021, alleged five counts — two under the Exchange Act and three under the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77a–77aa — against FirstEnergy, 25 of its current or former officers and directors, and 16 investment banks that underwrote two FirstEnergy debt offerings during the class period. Compl. ¶¶ 1, 268–322. Appellants, collectively referred to in this opinion as "FirstEnergy," are FirstEnergy and 17 of its current or former officers and directors. Appellants' Br. at ix.

This appeal concerns only Plaintiffs' first count: that FirstEnergy violated Exchange Act section 10(b) and SEC Rule 10b-5 because FirstEnergy "(a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FirstEnergy securities during the Class Period." Compl. ¶¶ 269–70.

Plaintiffs alleged that what they described as "the Bailout Scheme" employed many methods and means, including nine specific ones: "(a) using bankruptcy proceedings to try to evade liability for the nuclear plants; (b) concealing the Bailout Scheme from the investing public and the bankruptcy court presiding over proceedings related to the nuclear plants; (c) paying lobbyists to orchestrate and execute the political corruption necessary to pass and preserve HB6; (d) creating and using a web of pass-through entities to transfer and conceal the money to finance the Bailout Scheme; (e) making personal payments to corrupt politicians and at least one regulator; (f) financing and supporting political campaigns with undisclosed contributions far greater than legally permitted; (g) using corrupted politicians to advance HB6

for consideration, to amend HB6 for FirstEnergy's additional benefit, and ultimately to pass the bill; (h) using a corrupted regulator to help write and support HB6; and (i) corruptly preventing a referendum to repeal HB6." *Id.* ¶ 93 (citation modified). And Plaintiffs alleged that these methods and means were "executed . . . through a series of materially false and misleading public statements." *Id.* ¶ 94.

The district court denied Defendants' motions to dismiss in relevant part in March 2022. *FirstEnergy*, 2022 WL 681320. In June 2022, Plaintiffs moved for class certification on behalf of FirstEnergy bondholders and purchasers of FirstEnergy stock between February 21, 2017, and July 21, 2020, who Plaintiffs argued "were injured in the same way by [FirstEnergy's] fraudulent scheme and violations of federal securities laws." *FirstEnergy*, 2023 WL 2709373, at *6.

The district court certified the class on March 30, 2023, after analyzing the complaint's five claims (only the first of which is at issue in this appeal) against various Defendants (many of whom are not Appellants here). *Id.* at *1. Before us now is a narrow, two-issue interlocutory appeal of the class-certification order: (1) the district court's grant of class certification on Plaintiffs' Exchange Act claims against FirstEnergy, and (2) the district court's analysis of Plaintiffs' proposed classwide-damages methodology for their Exchange Act Claims.

First, the district court held that Plaintiffs were entitled to the *Affiliated Ute* presumption of reliance because it "conclude[d] from a review of the relevant misstatements and omissions from Plaintiffs' Complaint that the communications at issue are primarily omissions-based." *Id.* at *20 (citation modified). The district court held that "[t]he statements at issue were injurious *because* they represented that FirstEnergy was pursuing various legislative and regulatory solutions and operating on solid ethical and legal footing while omitting information necessary to qualify or to place into doubt those contentions." *Ibid.* Next, after analyzing whether Plaintiffs had established predominance on the issue of damages by "present[ing] evidence of a class-wide method to demonstrate damages consistent with their theory of liability" for their Securities Act claims, the district court simply "conclude[d] that predominance exists with respect to [Exchange Act] damages for the same reasons as articulated in the previous section." *Id.* at *15–16, 19. The "previous section" referenced was section III.B.1.a.iii, where the district court had held that

"predominance is satisfied with respect to Plaintiffs' Securities Act claims" based on an analysis of the statutory formulas provided for damages under the Securities Act. *Id.* at \*14–16.

## II. STANDARD OF REVIEW

Because "a district court enjoys broad discretion to decide whether class certification is appropriate," we review a class-certification decision for "an abuse of that discretion." *In re Ford Motor Co.*, 86 F.4th 723, 727 (6th Cir. 2023) (per curiam). "A district court abuses its discretion when it relies on a clearly erroneous factual determination, applies the wrong legal standard, misapplies the correct one, or makes a clear error of judgment." *Ibid*.

## III. ANALYSIS OF RELIANCE

This case arises in a zone between securities-fraud claims under section 10(b) of the Exchange Act and the Federal Rule of Civil Procedure 23(b)(3) class-certification standard.

Section 10(b) and Rule 10b-5 establish an implied private cause of action. *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 573 U.S. 258, 267 (2014). "To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ibid.* (citation modified).

Plaintiffs sought class certification under Federal Rule of Civil Procedure 23(b)(3), which requires that plaintiffs show that "the questions of law or fact common to class members predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). Most plaintiffs in Rule 23(b)(3) securities-fraud class actions hope to establish a presumption of reliance, which makes it easier to establish predominance by "prov[ing] reliance through evidence common to the class." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 119 (2021).

Securities law recognizes two separate presumptions of reliance: the *Affiliated Ute* presumption and the *Basic* presumption. *See Affiliated Ute*, 406 U.S. at 153–54; *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 247 (1988). In cases "involving primarily a failure to disclose," the *Affiliated Ute* presumption establishes a presumption of reliance if an alleged wrongdoer had an "obligation to disclose" and "the facts withheld [are] material in the sense that a reasonable investor might have considered them important in the making of [a] decision [to invest]." *Affiliated Ute*, 406 U.S. at 153–54. In cases involving "public material misrepresentations," the *Basic* presumption establishes a presumption of reliance "on the integrity of the market price" and thus on the misrepresentations. *Basic*, 485 U.S. at 247. To invoke *Basic*, plaintiffs must establish: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268.

These presumptions apply to "two different circumstances": *Affiliated Ute* applies "if there is an omission of a material fact by one with a duty to disclose," and *Basic* applies if there are false public "statements at issue." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). But in applying this seemingly simple and settled dichotomy, two gray areas have developed. What exactly did the Supreme Court mean when it limited *Affiliated Ute* to cases involving "primarily" omissions? And how do mixed cases (cases alleging both omissions and misrepresentations) and half-truths (statements that are true on their face but omit critical qualifying information) fit into this framework of presumptions of reliance in securities cases?

As we discuss in sections III.B.3 and III.D.1 *infra*, all but one of our sister circuits have answered these questions, in varying detail, either by holding that *Affiliated Ute* is applicable only to cases that are primarily based on omissions, or by holding the contrapositive, that *Affiliated Ute* is not applicable if a case is primarily based on misrepresentations. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 85 (2d Cir. 2017); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193–94 (3d Cir. 2001); *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007); *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 717 (8th Cir. 1978); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021); *Joseph v. Wiles*, 223 F.3d 1155, 1162–63 (10th Cir. 2000);

*Cavalier Carpets, Inc. v. Vaylor*, 746 F.2d 749, 756 (11th Cir. 1984); *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 219–21 (D.C. Cir. 2010).

In each of these cases, different courts outlined different factors for characterizing what a mixed case is "primarily" based on, though it has been unclear which factors are most or least persuasive. As we outline in section III.D.1 *infra*, three factors that have uniformly informed the circuits' decisions and a fourth factor, derived from the Third Circuit's decision in *Johnston*, 265 F.3d 178, are the most critical indicators of whether a mixed case is primarily based on omissions. However, for the reasons discussed in section III.B.1 *infra*, *Affiliated Ute* must be narrowly viewed in the context of the severe evidentiary burden of proving reliance on something that was never said. Thus, while a mixed case can merit the *Affiliated Ute* presumption if the mixed case is primarily based on omissions, a federal court must prescribe this strong medicine only if the mixed case can clear the high bar of being primarily based on omissions by satisfying *all* four of these factors.

We hold today that a federal court in our circuit, in assessing what a mixed case is "primarily" based on, must follow a two-step analysis. First, it must classify each claim or group of claims as alleging either an omission or a misrepresentation. Both half-truths and generic, aspirational corporate statements are misrepresentations. Second, it must characterize whether the overall case is primarily based on omissions or on misrepresentations by analyzing whether any of these four factors are satisfied: (1) the alleged omissions are only the inverse of the misrepresentations, i.e., the only omissions are the truth that is misrepresented; (2) reliance is in fact possible to prove by pointing to an alleged misrepresentation and connecting it to an injury; (3) the preponderance and primary thrust of the claims involve alleged misrepresentations made by the defendant(s); or (4) the alleged omissions have no standalone impact apart from any alleged misrepresentations. If even one of these four factors is satisfied, the mixed case is primarily based on misrepresentations and thus subject to analysis under the *Basic* presumption. If and only if none of these four factors are satisfied, then the mixed case is primarily based on omissions and thus subject to analysis under the *Affiliated Ute* presumption. In this appeal, the allegations at issue make up a mixed case that is primarily based on misrepresentations. This case is therefore subject to analysis under *Basic*, not *Affiliated Ute*.

We agree, then, with the district court that the legal standard should be to analyze a mixed case under *Affiliated Ute* only if it is primarily based on omissions, and we establish that as the law in our circuit. But the district court still abused its discretion when it incorrectly applied that standard and concluded that in this case "the communications at issue are primarily omissions-based." *FirstEnergy*, 2023 WL 2709373, at \*20. Separately, the district court also incorrectly overlooked *Comcast*'s rigorous-analysis requirement in its damages analysis of Plaintiffs' Exchange Act claims. Thus, we vacate the class-certification order to the extent that it applied the *Affiliated Ute* presumption of reliance to the claims against Appellants and remand for the district court to conduct a proper damages analysis under the standard set forth in *Comcast*.

## A. *The Unique Limits of* Affiliated Ute

*Affiliated Ute* addresses a unique problem: the great difficulty of showing reliance on something that was never said.

### 1. The Supreme Court's Decision

*Affiliated Ute* arose from the Ute Partition Act of 1954, Pub. L. No. 671, 68 Stat. 868, which implemented the federal government's Indian-termination policy by seeking to assimilate Native Americans through, among other things, ending recognition of the sovereignty of tribes and federal trusteeships over tribal reservations. A central purpose of the Act was to distribute the Ute Indian Tribe's assets "between the mixed-blood and the full-blood members" of the tribe. *Affiliated Ute*, 406 U.S. at 134. But another goal was to keep tribal assets within the tribe to the extent possible. As a result, the Ute Distribution Corporation ("UDC") — created to manage the assets of the tribe — issued 10 shares of its stock to each "mixed-blood" member but required under UDC's articles that, for a period, any "mixed-blood" shareholder looking to sell his stock "first [had] to offer it to members of the tribe." *Id.* at 136–37. A tribal share could only be sold to a nonmember if no tribal member accepted the offer, and the price could be no lower than that offered to members. *Id.* at 137.

UDC appointed the First Security Bank of Utah, N.A. ("Bank"), to become its stock-transfer agent and gave the Bank careful guidelines for ensuring that the first-refusal

conditions were met. Share certificates were to be "stamped [with] a prescribed legend referring to those sale conditions" and other information, including that the stocks' "future value or return could not be determined." *Ibid.* And "[u]pon the sale to a nonmember, the seller [was to] furnish[] an affidavit to the [reservation] superintendent stating the amount he had received." *Id.* at 139.

But, in the shadows of this careful plan, two Bank officers secretly "developed and encouraged" a secondary market where the tribal shares were selling for a higher price than the price at which the "mixed-blood" tribe members were selling their shares in the first instance. *Id.* at 153. The officers built this secondary market by "soliciting and accepting standing orders from non-Indians," and they "received increased deposits" for themselves and the Bank as well as "commissions and gratuities from the expectant non-Indian buyers." *Id.* at 152. The officers facilitated the sale of "1,387 shares of UDC stock to nonmembers" and themselves purchased about 8% of those shares. *Id.* at 146–47. The officers benefitted financially because, while shares were being sold by tribe members at $300 to $700 per share, shares were being sold between nonmembers on this secondary market at an inflated $500 to $700 per share. *Id.* at 147. Tribe members sued the Bank and the two officers under the Exchange Act and Rule 10b-5. *Id.* at 140.

The Court first held that the officers had violated Rule 10b-5 because "the record reveal[ed] [the] misstatement of a material fact . . . that the prevailing market price of the UDC shares was the figure at which their purchases were made." *Id.* at 152. The Court also determined that, in addition to 10b-5(b) liability for the affirmative misstatement about market price, 10b-5(a) and (c) also applied to the "'course of business' or [the] 'device, scheme, or artifice' that operated as a fraud upon the Indian sellers." *Id.* at 153. "[B]ecause the defendants devised a plan and induced the mixed-blood holders of UDC stock to dispose of their shares without disclosing to them material facts that reasonably could have been expected to influence their decisions to sell[,] . . . . they possessed the affirmative duty under [Rule 10b-5] to disclose [that they were market makers] to the mixed-blood sellers." *Ibid.*

The Court then went on to hold that, "[u]nder the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153–54. The Court thus established the *Affiliated Ute* presumption: "a rebuttable presumption of reliance . . . . if there is an omission of a material fact by one with a duty to disclose." *Stoneridge*, 552 U.S. at 159.

## 2. Our Circuit's Approach

This circuit has applied the *Affiliated Ute* presumption, for the most part, without confusion and only in passing. *See, e.g.*, *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 404 (6th Cir. 1997) (recognizing that *Affiliated Ute* had applied in an unrelated case only because, in that case, "a duty to disclose had arisen under the federal securities laws"); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005) (quoting *Affiliated Ute* only for its proposition that the purpose of the Exchange Act was "to substitute a philosophy of full disclosure for the philosophy of caveat emptor").

Of note is *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998) (en banc), where — faced with an appeal that involved both omissions and misrepresentations — we applied *Affiliated Ute* only to the omissions claim. *Rubin* involved a company that met with plaintiffs to discuss a potential investment into the company. *Id.* at 266. Plaintiffs asked about the company's "financial soundness as well as its relationship with [the bank]" that was its principal source of operating capital. *Ibid.* The company's attorney said that "there was no problem" with the line of credit with the bank, and that, after their investment, the bank "would increase the amount of funding that it was providing." *Ibid.* And when the plaintiffs' attorney asked whether the bank would permit the plaintiffs to take a security interest in the company's assets, the company's attorney said that the company "was doing fine" with the bank, though the bank "would be reluctant to permit" the security interest. *Ibid.* In reality, the company "was already in default under its financing agreement" with the bank, "the granting of a security

interest would constitute another incident of default," and "the proposed investment itself would constitute a default." *Ibid.*

However, *Rubin*'s unique procedural posture renders that case mostly unhelpful to ours. Plaintiffs initially sued alleging only omissions — the company's attorney's failure to mention default. *Id.* at 268. Then, upon defendants' motion for judgment on the pleadings, plaintiffs submitted new affidavits and alleged, for the first time, that the company's attorney made misrepresentations to them about the company's relationship with the bank. *Id.* at 270 n.1 (Kennedy, J., dissenting). Because of that procedural posture, we analyzed reliance in two separate sections of the opinion — one for the omissions argument (*Rubin* section II.B.1) and another for the misrepresentations argument (*Rubin* section II.B.2) — and straightforwardly applied *Affiliated Ute* only to the omissions argument. *See id.* at 268–69. Thus, *Rubin* says nothing about our question today: how a court must analyze at class certification a mixed case that alleges both omissions and misrepresentations together in the complaint.

At times, we have analyzed in more depth the scope of *Affiliated Ute*. In *In re BancorpSouth, Inc.*, we held that a district court's application of *Affiliated Ute* at class certification was not an abuse of discretion. No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017). And, most recently, in *In re Acadia Healthcare Co.*, we presciently recognized that "we have not definitively determined whether *Affiliated Ute* applies in cases with both misstatements and omissions." No. 22-0506, 2023 WL 3620955, at *3 (6th Cir. May 23, 2023).

This case presents the need to make that determination.

B.   *"Primarily Based on Omissions"*

*Affiliated Ute* applies to cases purely or primarily based on omissions.

1.   The Line Between *Affiliated Ute* and *Basic*

The Supreme Court has held that the two presumptions of reliance apply "in two different circumstances" — *Affiliated Ute* "if there is an omission," and *Basic* if there are public "statements at issue." *Stoneridge*, 552 U.S. at 159. In *Basic*, the Court held that the entire point of the *Affiliated Ute* presumption was to prevent "an unnecessarily unrealistic evidentiary burden

on the Rule 10b-5 plaintiff": how a plaintiff "would have acted" if certain omitted information had been disclosed. *Basic*, 485 U.S. at 245. The Court then declined to apply *Affiliated Ute* at all, presumably because this evidentiary problem did not exist for the fraud-on-the-market theory, under which a plaintiff could always point to misrepresentations without which a liquid secondary-trading market would not have inflated a stock price to a particular point.

Therefore, this line is clear. "Concerns with the judicial creation of a private cause of action caution against its expansion," and "the § 10(b) private right should not be extended beyond its present boundaries." *Stoneridge*, 552 U.S. at 165. In the distinction between *Affiliated Ute* and *Basic*, each presumption has its own boundaries. There are omission cases, to which *Affiliated Ute* may apply. And then there are misrepresentation cases, to which *Basic* may apply.

2. Mixed Cases Can Primarily Involve Omissions

*Affiliated Ute* clearly applies to cases purely about omissions — cases where all of the allegations concern a "withholding" or "failure to disclose." *Affiliated Ute*, 406 U.S. at 153–54; *Rubin*, 143 F.3d at 268 (applying *Affiliated Ute* to analyze only defendant's total "failure to mention that [the company] was in default at the time the proposed investment was being negotiated, or that the proposed investment would itself constitute a default").

In addition, we hold that *Affiliated Ute* can also apply to a mixed case — one that alleges both omissions and misrepresentations — but only if that mixed case primarily involves omissions. Textually, the *Affiliated Ute* presumption applies in cases that involve "*primarily* a failure to disclose." *Affiliated Ute*, 406 U.S. at 153 (emphasis added). Three core tenets of the decision — the remedial philosophy of securities regulation, the duty to disclose, and the concept of materiality — confirm that *Affiliated Ute*'s remedy for the "unnecessarily unrealistic evidentiary burden," *Basic*, 485 U.S. at 245, of proving reliance on a representation that was never made is still necessary in a mixed case as long as it is primarily based on omissions.

First, in *Affiliated Ute*, the Court emphasized its long history of recognizing how "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'"

*Affiliated Ute*, 406 U.S. at 151 (quoting *SEC v. Cap. Gains Rsch. Bureau*, 375 U.S. 180, 195 (1963)).

It would defy this philosophy to apply *Affiliated Ute* only to pure-omissions cases. The remedial purpose of this presumption is to address the difficulty of proving reliance on a speculative negative. This is a necessary remedy when a case is 100% about omissions. But the remedy is still necessary where a case is 99% about omissions and 1% about misrepresentations. For 99% of that case, plaintiffs still face the hurdle of proving reliance on something that was never said. We therefore do not think that the Court intended such a restrictive boundary.

Second, the defendants in *Affiliated Ute* owed an "affirmative duty under [Rule 10b-5] to disclose" the facts that they omitted. *Id.* at 153. It is unclear exactly what "duty" was meant. The cited case for this quote was a Second Circuit case that involved both market making and "common law fiduciary duty," but the decision eventually declined to reach the cross-appealed question of whether "the district court erred in finding no violation of a common law fiduciary duty to [plaintiff] by [a market maker] in the way [plaintiff's] account was handled." *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173–74 (2d Cir. 1970). Though the Court in *Affiliated Ute* never used the word "fiduciary," it relied on the idea of the closeness of the relationship between the officers and the tribal members. As market makers, a duty to disclose attached such that the officers could "not stand mute while they facilitate[d] the [tribal members'] sales to those seeking to profit in the non-[tribal] market the [officers] had developed and encouraged and with which they were fully familiar." *Affiliated Ute*, 406 U.S. at 153. And the tribal members "had the right to know that the defendants were in a position to gain financially from their sales and that their shares were selling for a higher price in that market." *Ibid.*

When it comes to this duty, the difference between a case that is 100% omissions and a case that is 99% omissions and 1% misrepresentations is illusory. Under *Affiliated Ute*, assuming that there is an affirmative duty to disclose arising from some sort of relationship of trust and confidence, an omission is a clear failure to satisfy this duty. And if the withheld fact is material, a plaintiff need not explicitly prove reliance on something that was never said. But

even in the 99%-omissions case, assuming the same affirmative duty to disclose exists, the omissions would be a no less abundantly clear failure to satisfy that duty.

Third, the withheld or omitted fact in *Affiliated Ute* was "material" — a fact that "a reasonable investor might have considered . . . important in the making" of a decision to invest. *Id.* at 153–54. If plaintiffs are unknowingly the victims of an omission that is central to the transaction, it would not make sense to allow them the evidentiary benefit of *Affiliated Ute* if the claims are "purely omissions" but then block the evidentiary benefit of *Affiliated Ute* just because the plaintiffs' claims also involve 1% misrepresentations (when the 99% omissions are the animating crux of the case).

### 3. Other Circuits' Approaches

Similarly, nearly all our sister circuits have either held that *Affiliated Ute* is applicable only to cases that are primarily based on omissions, or held the contrapositive, that *Affiliated Ute* is not applicable if a case is primarily based on misrepresentations. *See Waggoner*, 875 F.3d at 85 ("[T]he *Affiliated Ute* presumption does not apply [if a plaintiff's] claims are primarily based on misstatements, not omissions . . . ."); *Volkswagen*, 2 F.4th at 1204 ("*Affiliated Ute* . . . is limited to cases that primarily allege omissions and present plaintiffs with the difficult task of proving a speculative negative."); *Cavalier Carpets*, 746 F.2d at 756 ("This Circuit has recognized the limited reach of the *Ute* presumption, applying it only in primarily omission cases in which a duty to disclose existed."); *see also Johnston*, 265 F.3d at 193–94; *Credit Suisse First Bos.*, 482 F.3d at 384; *Vervaecke*, 578 F.2d at 717; *Joseph*, 223 F.3d at 1162–63; *Interbank*, 629 F.3d at 219–21.

We are unconvinced by the Fourth Circuit's holding in *Cox v. Collins* that *Affiliated Ute* is "not warranted . . . when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure." 7 F.3d 394, 395–96 (4th Cir. 1993). That court seems to have held that *Affiliated Ute* is categorically inapplicable to all mixed cases. But, as discussed in section III.B.2 *supra*, *Affiliated Ute* should not be limited to pure-omissions cases. And both cases cited in *Cox* for this restrictive holding in fact held that *Affiliated Ute can* apply to a mixed case (*if* it is primarily based on omissions): *Cavalier Carpets*, 746 F.2d at 756,

where the Eleventh Circuit held that *Affiliated Ute* "appl[ied] . . . only in primarily omission cases," and *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987), where the Fifth Circuit held that a case being "primarily a nondisclosure case . . . would make the [*Affiliated Ute*] presumption applicable."

## C.  Half-Truths and Corporate Aspirations

We first hold that half-truths and the generic, aspirational corporate statements involved here are both species of misrepresentations.  Both are quite different from the "standing mute" seen in *Affiliated Ute*, where plaintiffs were left "with absolutely nothing upon which to rely." *Cavalier Carpets*, 746 F.2d at 755.

### 1.  Half-Truths

Rule 10b-5(b) has always grouped half-truths and affirmative misstatements together. *See* 17 C.F.R. § 240.10b-5(b).  But the Supreme Court has distinguished half-truths from omissions. *Macquarie Infrastructure Corp. v. Moab Partners* concerned a company that omitted an important risk factor that should have been filed with the SEC in a periodic informational statement known as the "Management's Discussion and Analysis of Financial Conditions and Results of Operation," or MD&A.  601 U.S. 257, 260–62 (2024).

The Court noted that "[a] pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." *Id.* at 263.  For example, "[i]f a company fails entirely to file an MD&A, then the omission of particular information required in the MD&A has no special significance because no information was disclosed." *Ibid.*

"Half-truths, *on the other hand*, are representations that state the truth only so far as it goes, while omitting critical qualifying information." *Ibid.* (emphasis added) (citation modified). Even if a statement is literally accurate, it is a half-truth and ultimately a misrepresentation if it ends up misleading someone "by saying one thing and holding back another." *Ibid.* (citation modified). "[T]he difference between a pure omission and a half-truth is the difference between a child not telling his parents he ate a whole cake and telling them he had dessert." *Ibid.*  When one says a half-truth (e.g., "I had dessert"), she still "says" *something*, though she simultaneously

omits other qualifying information.  A half-truth, because of the "half" that *was* said, cannot be pure silence.

Thus, *Macquarie* establishes that half-truths are misrepresentations.  The Supreme Court recently examined an analogous distinction between half-truths and false statements in *Thompson v. United States*, 145 S. Ct. 821 (2025).  *Thompson* concerned 18 U.S.C. § 1014, which criminalizes "knowingly mak[ing] any false statement or report" in pursuing a federal loan or credit application, and whether that statute also criminalizes "statements that are misleading but not false."  *Id.* at 824–26.  The Court held that "a statement that is misleading but true is by definition not a 'false statement'" for the purposes of the statute because "it is not enough that a statement is misleading."  *Id.* at 826, 829.  But the Court was not saying that a half-truth is not a *statement*.  It was saying that a half-truth is not a *false* statement because a half-truth is a true statement (though a misleading one).  *Id.* at 826.

2.  Generic, Aspirational Corporate Statements

The other relevant question is how to classify generic corporate statements that reflect broad and aspirational declarations made in business dealings, or in reports and filings with the government.  Though securities-fraud class actions are usually "more successful to the extent they are based on statements that are concrete as opposed to merely aspirational," aspirational statements often play a central role in cases like this one — "event-driven litigation that is filed when bad news is correlated with a stock drop."  Adam B. Badawi & Frank Partnoy, *Social Good and Litigation Risk*, 12 HARV. BUS. L. REV. 315, 351, 355 (2022).

Such statements must be classified as misrepresentations for the purposes of applying a presumption of reliance at the class-certification stage.  Even the most generic and aspirational of corporate statements are still communications and acts of stating, reciting, or presenting.  *Macquarie* is clear: something cannot be a pure omission if it involves "affirmative assertions" or "statements made."  *Macquarie*, 601 U.S. at 264.

The Supreme Court's decision in *Goldman Sachs*, 594 U.S. 113, is also instructive.  *Goldman Sachs* involved allegations that "Goldman maintained an inflated stock price by making repeated misrepresentations about its conflict-of-interest policies and business practices."

*Id.* at 120. "The alleged misrepresentations [were] generic statements from Goldman's SEC filings and annual reports" and included statements such as: "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest," "[o]ur clients' interests always come first," and "[i]ntegrity and honesty are at the heart of our business." *Ibid.* In deciding the case, the Court repeatedly referenced "the generic nature of the[se] alleged *misrepresentations*," proceeding on the clear understanding that these generic statements (which are much like FirstEnergy's here) are not omissions. *See id.* at 126 (emphasis added); *see also id.* at 117, 121–23, 127.

    3. <u>The Underlying Philosophy of Our Narrow Construction of Omissions</u>

Every misrepresentation "omits" some part of the truth. Thus, a narrow legal construction of what constitutes an omission is important. An affirmative misstatement is directly incorrect. A half-truth, though literally true, fails to articulate necessary qualifiers and context. The full picture is concealed in both situations, whether altered from the start or obscured through half-truth. Thus, we decline to adopt a rule that any such concealment transforms a "misrepresentation" under *Basic* into an "omission" that is eligible for the *Affiliated Ute* presumption.

The critical differences between a colloquial, dictionary definition of "omission" and the specialized *Affiliated Ute* concept of "omission" counsel against allowing concealment via half-truth to qualify for use of the *Affiliated Ute* presumption. Because every misrepresentation includes some sort of "concealment," the right way to think about *Affiliated Ute* is as a narrow case premised on the conceptual difficulty of proving reliance on a representation that was never made. Expanding *Affiliated Ute* from that specific context all the way to half-truths would improperly grant a presumption of reliance solely by virtue of crafty pleading and claim design.

Such an expansion of *Affiliated Ute* would also fly in the face of *Basic* and the decades of precedent that have followed its strongly drawn line between omissions and misrepresentations. *Basic* declined to interpret or apply *Affiliated Ute* because *Basic*'s facts involved misrepresentations, not omissions. And the decades of precedent that have come after *Basic* have carefully crafted and refined *Basic*'s prerequisites, logic, and mechanics of presumption

rebuttal against the backdrop of misrepresentations. *See, e.g.*, *Halliburton II*, 573 U.S. at 283–84 (affording defendants the "opportunity before class certification" to rebut price impact).

*Basic* and *Affiliated Ute* are two different mechanisms to achieve a presumption of reliance in securities-fraud cases: *Basic* is for when a case is primarily about misrepresentations, and *Affiliated Ute* is for when a case is primarily about omissions.

## D.  Affiliated Ute *Does Not Apply*

We hold that a mixed case — a case that alleges both omissions and misrepresentations — is primarily based on *misrepresentations* if any one of these four factors is satisfied: (1) the omissions are only the inverse of the misrepresentations, or the only omissions are the truth that is misrepresented; (2) reliance is practically possible to prove by pointing to a misrepresentation and connecting it to the injury; (3) the preponderance and primary thrust of the claims involve misrepresentations made by the defendant(s); or (4) the alleged omissions have no standalone impact apart from any alleged misrepresentations.

A mixed case is primarily based on *omissions* — and thus eligible to access the *Affiliated Ute* presumption — only where the mixed case fails all four factors.  To the extent possible, in making this determination a court should first classify each claim or group of claims as based on either omissions or misrepresentations.  This provides a concrete basis for understanding the mixed case's division between the two categories, although a raw percentage of either omissions or misrepresentations is never dispositive.  Second, a court should apply the above four factors. If and only if the case fails all four factors — i.e., the omissions are *not* only the inverse of the misrepresentations, reliance is *not* practically possible to prove by pointing to a misrepresentation and connecting it to the injury, the preponderance and primary thrust of the claims do *not* involve misrepresentations, *and* the omissions alleged *do* have standalone impact apart from the misrepresentations alleged — then the case is primarily based on omissions.

Under this test, we hold that *Affiliated Ute* does not apply here because this case is primarily based on alleged misrepresentations.

1.  Factors Across the Circuits

In coming to this new test, we are informed by the approaches of a few of our sister circuits and by the narrow structural limits of the original *Affiliated Ute* decision.

Our sister circuits' analyses of whether a mixed case is primarily based on omissions or misrepresentations have generally considered various factors showing a case's overall character as omission or misrepresentation, although the factors considered have differed across the circuits.

In *Waggoner*, the Second Circuit held that a mixed case was not comprised primarily of omission claims because (1) "Plaintiffs are . . . not in a situation in which it is impossible for them to point to affirmative misstatements," (2) "Plaintiffs focus their claims on those affirmative misstatements," and (3) the typical alleged omissions were "simply the inverse of the Plaintiffs' misrepresentation allegations" and served solely to "exacerbate the misleading nature of the affirmative statements." 875 F.3d at 96 (citation modified).

In *Johnston*, the Third Circuit held that a mixed case was primarily based on misrepresentations because (1) a misrepresentation "should not be transformed into an omission simply because the defendants failed to disclose that the allegedly misleading fact was untrue," (2) "the omission alleged would have no impact absent the misrepresentation, or in other words, a misrepresentation is necessary to create the specific expectation that the omission does not negate," and (3) "this case is not one where reliance would be difficult for the plaintiffs to prove, . . . as presumably plaintiffs know whether they acted on or as a result of the information made available to them." 265 F.3d at 193.

In *Volkswagen*, the Ninth Circuit held that a case was "outside *Affiliated Ute*'s narrow presumption" because (1) "the alleged omission . . . was but one part of a much broader claim," (2) the "claims are based as much on what is *there* as what is purportedly missing," (3) though an "omission looms large . . . . Plaintiff also alleges more than nine pages of affirmative misrepresentations," (4) the "omission is simply the inverse of the affirmative misrepresentations," and (5) "Plaintiff can prove reliance through ordinary means by

demonstrating a connection between the alleged misstatements and its injury." 2 F.4th at 1205–09.

Circuits have not been clear as to how many of their factors must be satisfied. But four factors suggesting that a case is primarily based on misrepresentations seem most salient, and there is circuit agreement on three of the four. The first is whether the omissions are only the inverse of the misrepresentations, in that the "omissions" are essentially the same as the alleged misrepresented truths. This language and logic are echoed in *Waggoner* Factor 3,[1] *Johnston* Factor 1, and *Volkswagen* Factor 4. The second is whether reliance is practically possible to prove by pointing to some actual misrepresentation and connecting it to the injury. This language and logic are echoed in *Waggoner* Factor 1, *Johnston* Factor 3, and *Volkswagen* Factor 5. The third is whether the preponderance and primary thrust of the claims involve misrepresentations made by the defendant(s). This language and logic are echoed in *Waggoner* Factor 2, *Volkswagen* Factor 2, and *Volkswagen* Factor 3. Finally, the fourth factor that we find valuable is *Johnston* Factor 2: that the omissions alleged have no standalone impact apart from any alleged misrepresentations.

We hold that all four of these factors must indicate that a mixed case is primarily based on omissions. If a case satisfies even one factor, that means that misrepresentations constitute the essence of the case. But to warrant application of the powerful medicine that is the *Affiliated Ute* presumption of reliance, a mixed case must incontrovertibly revolve around omissions. For the reasons that now follow, the case before us is not such a case.

2. Classifying Each Allegation

Plaintiffs alleged what we categorize now into thirteen groupings of section 10(b) claims concerning "materially false and misleading statements and omissions" by FirstEnergy. Compl. ¶¶ 95–142. Most of these claims arise from various filings with the SEC, but others arise from sources such as earnings calls, corporate employment policies, and statements to reporters and conference attendees. These allegations all involve publicly disseminated false statements and

---

[1]This numbering is not used in the other circuits' opinions but is our tracking of the order in which those opinions discuss the factors.

thus are equally actionable platforms for private securities litigation. *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) (en banc). Before we discuss the four factors outlined above, we first classify each grouping as alleging either omissions or misrepresentations.

The first grouping concerns FirstEnergy's initial discussions in 2016 and 2017 about legislative solutions and efforts. Across the company's 2016 10-K, 2017 10-K, 2017 10-Qs, and 2017 proxy statements, the company "indicated" that it was pursuing "[l]egislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." Compl. ¶¶ 95–96 (emphasis omitted). FirstEnergy also stated that "management is exploring . . . options to improve cash flow as well as continuing with legislative efforts to explore a regulatory type solution." *Id.* ¶ 96 (emphasis omitted). These were classic half-truths. The allegation is that FirstEnergy made a representation that itself was "true" — that it was pursuing legislative solutions and efforts to improve the standing of the company — but stated the "truth" only generally, "omitting critical qualifying information": that it was pursuing solutions based in significant part on a bribery arrangement going on in the background. *Macquarie*, 601 U.S. at 263 (citation modified). Misrepresentations.

The second grouping concerns FirstEnergy's assurances about compliance with state and federal regulations. In the 2016 10-K and other substantively similar 10-Ks and 10-Qs filed during the class period, FirstEnergy stated that it and its subsidiaries "comply with the related regulations, orders, policies and practices prescribed by the SEC [and various other state and federal regulatory agencies]." Compl. ¶¶ 97–98. This clearly alleges an affirmative misstatement: FirstEnergy was claiming that it was complying with regulations while breaking them. Misrepresentations.

The third grouping concerns FirstEnergy's statements about its effective and unchanged internal controls over financial reporting and disclosures. In its 10-Ks from 2016 to 2019 and 10-Qs from 2017 to 2020, FirstEnergy represented that its internal controls over financial reporting and disclosures were effective, stating that "management . . . have reviewed and evaluated the effectiveness of their . . . disclosure controls and procedures . . . . Based on that evaluation, the chief executive officer and chief financial officer . . . have concluded that . . .

disclosure controls and procedures were effective as of the end of the period covered by this report." *Id.* ¶ 99. FirstEnergy also stated that "there were no changes in internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, FirstEnergy's . . . internal control over financial reporting." *Id.* ¶ 100. There are two ways to view this claim. Option 1 is that these statements were affirmative misstatements: the company represented that the disclosure controls and procedures were effective, but they could not have been effective if the bribery was going on the whole time. Option 2 is that these statements were half-truths: maybe the procedures were designed to exclude oversight of bribery schemes, so it was "true" that the procedures were "effective." In that case, the half-truth would come from the omission of the critical qualifying information that the procedures didn't cover bribery. Either way, misrepresentations. *See Goldman Sachs*, 594 U.S. at 116 (addressing as a misrepresentation the claim that "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest").

The fourth grouping concerns FirstEnergy's statements, made in various SEC filings throughout the class period, about risks and uncertainties. Plaintiffs alleged that though FirstEnergy listed "'Risk Factors' on a variety of subjects which purportedly included the most significant risks facing the Company" — such as risks from "deactivation of one or more of the nuclear generating units," "Weather Conditions," and even "Cyber-Attacks" — "[n]one of the Company's SEC filings mentioned any risks in connection with the Bailout Scheme." Compl. ¶ 101. Plaintiffs also alleged that FirstEnergy's "failure to disclose [its] involvement in the largest bribery and corruption scheme in Ohio history . . . violated Item 303" of SEC Regulation S-K, which required FirstEnergy in its SEC filings' Management's Discussion & Analysis to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," 17 C.F.R. § 229.303(b)(2)(ii). *Id.* ¶¶ 139–42. But both claims allege half-truths, not pure omissions. Though FirstEnergy did not discuss its bribery arrangement as a Risk Factor, Plaintiffs recognize that it did discuss numerous other Risk Factors. *Id.* ¶ 101. And though FirstEnergy did not discuss its bribery arrangement in its Management's Discussion & Analysis sections, it discussed in those sections various other uncertainties, such as "the stress of weak

energy prices, insufficient results from recent capacity auctions and anemic demand forecasts."
*See, e.g.*, FirstEnergy Corp./FirstEnergy Sols. Corp., Annual Report (Form 10-K) at 52–117
(Feb. 21, 2017). An example of "[a] pure omission" is "a company [that] *fails entirely to file* an
MD&A." *Macquarie*, 601 U.S. at 263 (emphasis added). But Plaintiffs' claims about the
undisclosed risk and uncertainty arise amidst other disclosed risks/uncertainties that, as alleged,
are half-truths because they were representations that stated the truth only so far as it went. In
other words, FirstEnergy misrepresented the overall picture in its listing of Risk Factors and the
Management's Discussion & Analysis. *Ibid.* Misrepresentations.

The fifth grouping concerns various directors' signed certifications with the SEC
attesting that FirstEnergy's SEC filings "do[] not contain any untrue statement of a material fact
or omit to state a material fact necessary to make the statements made, in light of the
circumstances under which such statements were made, not misleading." Compl. ¶ 102. This
claim alleges an affirmative misstatement because the directors did allegedly omit necessary
qualifying facts showing the full picture of the bribery arrangement. Misrepresentations.

The sixth grouping concerns a director's statements concerning dialogue between
FirstEnergy and Ohio legislators. During a February 2017 earnings call, FirstEnergy's then-CEO
Charles E. Jones stated, "[w]e continue to assess and evaluate a number of strategic alternatives
for our companies for our competitive business, including asset sales, legislative or regulatory
initiatives for generation." *Id.* ¶ 103. Jones also said that, "[i]n Ohio, we have had meaningful
dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's
future energy security. . . . We are advocating for Ohio's support for its two nuclear plants . . . .
We are optimistic, given these discussions we have had so far." *Ibid.* (emphasis omitted). These
are clear half-truths. It was technically the truth that FirstEnergy was pursuing legislative
initiatives, dialogue, and support. The allegation is that FirstEnergy didn't mention that these
initiatives, dialogue, and support also involved bribery. Misrepresentations.

The seventh grouping concerns FirstEnergy's remarks in its 2017 proxy statements and
Corporate Responsibility Reports from 2019 and 2020 concerning its "good corporate
governance," "integrity," "openness," and "trust." *Id.* ¶ 104. FirstEnergy represented these as its

core "behaviors" and discussed its corporate responsibility as "upholding high standard[s] for corporate governance." *Ibid.* Expanding on its statement of core values, FirstEnergy claimed that "[w]e consistently demonstrate ethical behaviors, values, expectations and outcomes" (integrity), "[w]e communicate openly and honestly" (openness), and "[w]e are honest, reliable, respectful, consistent, dependable and credible. We are committed to doing what's right" (trust). *Ibid.* And in its 2017 proxy statement, FirstEnergy emphasized that "[b]y engaging with elected officials, regulators, community and business leaders, and other decision makers, [it] strives to conduct its business as transparently as possible to service customers effectively and help build public trust." *Id.* ¶ 110 (emphasis omitted). These generic corporate statements are nearly identical to the misrepresentations in *Goldman Sachs*, where the defendant had written that "[i]ntegrity and honesty are at the heart of our business." *Goldman Sachs*, 594 U.S. at 120. These aspirational statements are alleged half-truths. Because they are framed as "behaviors" and goals "strive[d]" toward, it is "true" that these are the *aspirational* behaviors and values *espoused* by the company. However, the allegation is that these statements did not address the full truth that the company's actual behaviors included bribery. Misrepresentations.

The eighth grouping concerns statements made in FirstEnergy's Code of Business Conduct, which the company's proxy statements from 2017–2020 said "applies to all employees," and FirstEnergy's Director Code of Conduct. Compl. ¶ 105.

- "At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job."

- "As FirstEnergy employees, we are all responsible for complying with the principles included in this Code."

- "It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures."

- "We are committed to maintaining the highest levels of integrity and fairness . . . ."

- "Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes. . . . Do not knowingly cause corporate funds to be used for unlawful purposes . . . ."

- "[Employees] must conduct business . . . honestly and fairly and not take unfair advantage of anyone through any misrepresentations of material facts, . . . bribes,

kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government employees."

- "Directors shall also ensure that the Company's assets are being used efficiently and for legitimate business purposes. . . . Directors shall comply, and oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company."

*Id.* ¶¶ 105–09 (emphasis omitted).

These generic and aspirational code-of-conduct statements are also all alleged half-truths. It is "true" that the employees are "responsible for upholding high standards" of ethics and compliance with the law. It is "true" that the company's aspirational stance is that company assets and funds may only be used for legitimate and legal business purposes. It is "true" that employees are expected to conduct business honestly and fairly, and to not be involved in anything like a bribe. And it is "true" that all directors are expected to — "shall" — comply with all laws and rules. But that is the problem with the concept of "shall." While all these aspirational "shalls" are "true" statements of corporate goals and expectations, the allegation is that FirstEnergy never revealed the bribery-and-bailout arrangement that violated these goals — critical qualifying information for investors to see the full picture of what was going on with the company. Misrepresentations.

The ninth grouping concerns FirstEnergy's Corporate Political Activity Policy. The policy stated that FirstEnergy "has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible . . . . Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations." *Id.* ¶ 111. As alleged, the first sentence is a half-truth. It was "true" that the company had these oversight processes, but the company didn't disclose the bribery, which certainly qualifies as something that would have been caught in such oversight processes. The second sentence is an affirmative misstatement. FirstEnergy claimed that its political contributions were legal, but it had participated in bribery. Misrepresentations.

The tenth grouping concerns various quotes in the news from FirstEnergy directors discussing appreciation for and engagement with legislative solutions. Two articles noted

FirstEnergy's desires for legislative action. Others explicitly noted the active role that FirstEnergy wanted to take in pursuing legislative support and the optimism that FirstEnergy felt about the prospect of legislative support.

- "FirstEnergy applauds Ohio lawmakers for introducing a thoughtful program that recognizes the significant benefits Ohio's nuclear power plants bring . . . ."

- "[L]egislation [for a zero-emission nuclear program] 'needs to happen and it needs to happen regardless of when it happens,' and [Jones] will continue to fight for it."

- "[FirstEnergy] seeks legislative policy solutions as an alternative to deactivation or sale."

- "We call on elected officials in Ohio . . . to consider policy solutions . . . . We stand ready to roll-up our sleeves and work with policy makers to find solutions that will make it feasible to continue to operate these plants in the future."

- "[W]e continue to pursue opportunities for . . . legislative and regulatory relief . . . ."

- "[W]e are actively seeking policy solutions at the state and federal level . . . ."

- "[A]dditional support at the state level will be necessary to protect the jobs in Ohio . . . . The company has advocated for solutions that recognize the critical attributes coal and nuclear plants provide . . . ."

- "Without legislative support . . . operating . . . will be a significant challenge. We remain optimistic that such support may be forthcoming, will solidify the tax base and tremendous economic value these plants provide . . . ."

*Id.* ¶¶ 112, 114, 119–20, 122–23, 125–26 (emphasis omitted).

None of these statements are affirmatively incorrect on their face. True, the company appreciated Ohio lawmakers' legislative efforts. True, FirstEnergy leaders sought legislative policy solutions and were ready to roll up their sleeves to work together with legislators for that cause. True, FirstEnergy was optimistic that legislative support was forthcoming. What makes all of these statements half-truths, however, is the qualifying information that FirstEnergy did not share. As alleged, FirstEnergy did not share that its appreciation, sleeve-rolling, and optimism about legislation were all bundled with the bribery of legislative officials. Misrepresentations.

The eleventh grouping is similar; it concerns statements, made by various directors at an energy conference and during various earnings calls, about FirstEnergy's involvement with and

commitment to legislative solutions.  These quotes primarily concerned the company's continued

work to make legislative solutions happen.

- "[W]e are working to get a bill on the governor's desk as quickly as possible."

- "I am going to continue to fight for this . . . legislation because it is the right thing to do for the state of Ohio."

- "[H]opefully, we'll be able to get some type of legislation introduced in Ohio as well as supported by the [G]overnor."

- "[W]hile the Ohio legislature was on recess this summer, we continued working on a modified approach to help compensate the state's nuclear plants . . . .  I think we've got to deal with the legislature first.  And then once we have the legislature passing the bill, then we'll see where the governor really is at that time."

- "FirstEnergy ha[s] been 'very actively involved in a multitude of efforts at both the state and federal levels to support our generation assets' . . . . [and is] 'continu[ing] to support policy solutions.'"

- "I will continue personally to advocate for regulatory or legislative solutions . . . ."

- "I'm going to continue to be a loud advocate for [keeping the nuclear plants open]."

- "[W]e have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission.  If they determine that they think the time is right to really put energy policy for the state back on the table in some fashion, legislatively, then we would expect to engage and provide our input."

*Id.* ¶¶ 113, 115–18, 121, 124, 127 (emphasis omitted).

These have the same problem that the tenth grouping does.  It is technically "true" that

FirstEnergy was working on, hopeful about, involved in, advocating for, and expecting to engage

in legislative solutions.  But the allegation is that FirstEnergy never shared the critical qualifying

information that all these efforts were happening in the form of bribery.  Misrepresentations.

The twelfth grouping concerns FirstEnergy's reflections — in SEC filings, earnings calls,

and news articles — after HB6's approval.

- "On July 23, House Bill 6 was approved by the Ohio legislature . . . . We believe this bill is good for customers . . . ."

- "House Bill 6 was approved by the Ohio legislature and signed by Governor DeWine yesterday. . . . I just want to take a moment to say how great it is in the State of Ohio to have leadership in Columbus who actually looks at issues and is willing to lead. I want to compl[i]ment our Governor, Lieutenant Governor, Senate President, Speaker of the House, numerous members of the legislature and Senate and the Chairman of the Commission because they all worked together on a very complex bill here, with the goal I think of providing stable and transparent rates for customers going forward and keeping their Ohio utilities strong at the same time. And I think they came up with an approach that was very strong in terms of looking out for this industry and our customers in the State of Ohio."

- "We are very pleased that Governor Mike DeWine signed HB6 following its successful bi-partisan passage in the General Assembly. . . . We're also thankful for the support and commitment by Speaker Householder and Senate President Obhof who understood the importance of protecting 90% of the state's zero-emissions electricity, substantial employment and the need to provide affordable rates from a diverse portfolio of generation sources for Ohioans."

- "Ohio enacted legislation establishing support for nuclear energy supply in Ohio."

- "FirstEnergy Corp. makes and discloses all campaign contributions in accordance with applicable state and federal laws."

- "FirstEnergy is a low-risk, fully regulated, stable and predictable wires utility that spans 5 states. . . . We have very good regulatory relationships in our jurisdictions."

*Id.* ¶¶ 128–34.

The first four statements are classic half-truths because, as alleged, while it was "true" that HB6 had been approved by the Ohio legislature and FirstEnergy was thankful for the work of the legislature in that process, FirstEnergy failed to disclose the critical qualifying information about the illegal political contributions it made in order to get HB6 passed. These expressions of thanks and appreciation were misleading as to who had really pushed HB6 through. The fifth statement is a half-truth because, as alleged, while it was technically "true" that FirstEnergy's alleged payments to get HB6 passed weren't all *campaign* contributions, FirstEnergy failed to disclose the critical qualifying information about the *political* contributions it made to Householder and Randazzo to get HB6 passed. The sixth statement is also a half-truth because, as alleged, while it is "true" that FirstEnergy may have generally had good regulatory

relationships in its jurisdictions, FirstEnergy failed to disclose the alleged bribes, which would certainly put such regulatory relationships and general legal respect/standing at great risk. Misrepresentations.

Finally, the thirteenth grouping concerns various disclosures of FirstEnergy's political contributions throughout the class period. Plaintiffs alleged that FirstEnergy did not accurately disclose its political contributions because of the concealed contributions that were part of the bribery arrangement. *Id.* ¶ 137. These are affirmative misstatements because the allegation is that these numbers were simply wrong. Misrepresentations.

### 3. Primarily Misrepresentations

As this grouping characterization foreshadows, this case is all about misrepresentations. A mixed case is primarily based on omissions — and thus able to benefit from the *Affiliated Ute* presumption — only where: (1) the omissions are *not* only the inverse of the misrepresentations, or the omissions are *not* only the truth that is misrepresented; (2) reliance is *not* practically possible to prove by pointing to a misrepresentation and connecting it to the injury; (3) the preponderance and primary thrust of the claims do *not* involve misrepresentations made by the defendant; *and* (4) the omissions alleged *do* have standalone impact apart from any alleged misrepresentations. None of these are true for this case, and thus it is subject to review only under the *Basic* presumption.

First, the omissions here are only the inverse of the misrepresentations. The question here is whether the "omissions" at issue are the same as the misrepresented truths, and whether any omissions simply serve to exacerbate the overall misleading fraud of the misrepresentations.

Plaintiffs argue in their complaint that the pervasive pure omission was that "[n]one of the Company's SEC filings mentioned any risks in connection with the Bailout Scheme." *Id.* ¶ 101. This argument concerns the problem of the lack of full, comprehensive disclosure concerning the behind-the-scenes political contributions. But that same problem, because of its high level of generality, is the core of all of Plaintiffs' misrepresentation-based claims, too.

Particularly in the case of the half-truths, the "omissions" of the critical qualifying information are solely the truth that was misrepresented. That is necessarily inherent in the definition of a half-truth. A 10-K statement that notes a pursuit of "legislative solutions" carries with it the natural presumption that the pursuit was legal; the "omission" is the fact that the pursuit in fact was illegal. An earnings-call statement that the company is pursuing "meaningful dialogue" carries with it the natural presumption that the dialogue is just dialogue; the "omission" is the fact that the "dialogue" in fact involved under-the-table contributions to political campaigns.

Second, reliance is in fact possible to prove here. The question here is simple: can plaintiffs point to a misrepresentation and connect it to the injury? The answer here is also simple: yes. Plaintiffs explicitly argue in their brief that "[t]his is a prototypical case for application of the *Affiliated Ute* presumption because FirstEnergy unlawfully schemed to defraud investors (Rule 10b-5(a)), made a series of *statements* that, while literally true, were materially misleading by omission (Rule 10b-5(b)), and engaged in a fraudulent course of business (Rule 10b-5(c)) through a series of acts and *statements* that concealed from investors a massive criminal conspiracy that FirstEnergy was executing to address its self-proclaimed 'top priority' — bailing out its failing nuclear plants." Appellees' Br. at 27 (emphasis added).

In other words, Plaintiffs admit that most of their argument for application of *Affiliated Ute* is based on the statements that FirstEnergy *did* make. Unlike the plaintiffs who faced an impossible evidentiary burden in *Affiliated Ute*, Plaintiffs here need not prove reliance on something that never happened. FirstEnergy's statements very much happened.

Third, the misrepresentations made by the Defendants are the preponderance and primary thrust of the claims here. The question here is: are Plaintiffs' claims "focused" on the misrepresentations, i.e., are the claims based as much on what was stated as on what is purportedly missing? One indicator is numerical preponderance, and all the claims here allege misrepresentations. While not dispositive, we agree with the Ninth Circuit that numerical scrutiny of mixed cases can be persuasive as an initial indicator of facial preponderance based on the complaint's allegations. *Volkswagen*, 2 F.4th at 1206 (emphasizing that, though one

"omission looms large," "Plaintiff also alleges more than nine pages of affirmative misrepresentations").

Another indicator is a more substantive preponderance — whether the claims are based more on what was said than on what was missing. In *Waggoner*, the Second Circuit concluded that the plaintiffs' claims were focused on affirmative misstatements because they emphasized that the defendant had "touted LX as a safe trading venue" and "consistently assured the public that its dark pool was a model of transparency and integrity." 875 F.3d at 96. And in *Volkswagen*, the Ninth Circuit found that the plaintiff's claims were "based as much on what is *there* as what is purportedly missing" because the plaintiff pled "reliance on extensive, detailed, and specific affirmative misrepresentations." 2 F.4th at 1208 (citation modified). Thus, the Second Circuit looks for emphases in class-certification requests on action verbs denoting affirmative misstatements; the Ninth Circuit seems slightly more willing to see pleading reliance on misrepresentations (i.e., satisfaction of our second factor) as sufficient to satisfy our third factor, as well. Our case concerns a substantive preponderance of misrepresentations under either circuit's approach. Our analysis of the thirteen groupings of misrepresentations in this case shows a long procession of statements made: assurances, certifications, reflections, aspirations — in short, there is a lot "there." And Plaintiffs expressly alleged that they suffered damages "in reliance" on the integrity of the market and that they would not have suffered so had they been aware that the market prices were "falsely inflated by defendants' *misleading statements*." Compl. ¶ 271 (emphasis added).

Fourth, the omissions alleged here do not have standalone impact apart from the alleged misrepresentations. The question here is whether the alleged omission would have no impact without the misrepresentation — whether the "misrepresentation is necessary to create the specific expectation that the omission does not negate." *Johnston*, 265 F.3d at 193. In *Johnston*, the Third Circuit found this to be true where a film company failed to inform the plaintiffs that a famous producer was not under contract to produce movies (omission) and also stated that this producer would produce movies (misrepresentation). *Ibid.* Thus, because the misrepresentation had been made, the company's omission carried special meaning in terms of the plaintiffs' expectations about the producer in the context of that misrepresentation. *Ibid.* For the

half-truths in this case — the only "omissions" alleged — the "omitted" critical qualifying information does not have standalone impact apart from this case's alleged misrepresentations.

Take, for example, our discussion of the fourth grouping: FirstEnergy's failure to discuss in its SEC filings any bribery-related risk factors and uncertainties. These omissions only had an impact on investors because the investors had presumably read through the detailed "Risk Factors" and "Management's Discussion & Analysis" sections in FirstEnergy's filings and assumed that these sections provided the full picture. It was only because of investors' perception of a seemingly full picture of risks and uncertainties that FirstEnergy's alleged omissions carried special meaning.

To access the *Affiliated Ute* presumption, Plaintiffs' claims must satisfy none of the four factors for determining whether a mixed case is primarily based on misrepresentations. But they satisfy every single one.

*E. Limited Remand*

The district court abused its discretion by holding that this mixed case was primarily based on omissions and that *Affiliated Ute* thus applied. But we emphasize that we are issuing a limited remand, vacating the class-certification decision only to the extent that the district court applied *Affiliated Ute*, which was the only issue presented to us on appeal. This appeal is not about whether it was proper for the district court to hold that "Plaintiffs would be entitled to the *Basic* presumption of reliance even if *Affiliated Ute* were inapplicable." *FirstEnergy*, 2023 WL 2709373, at \*22.

## IV. EXCHANGE ACT DAMAGES METHODOLOGY

Finally, in granting class certification as to Plaintiffs' Exchange Act claims, the district court incorrectly overlooked *Comcast*'s classwide-damages requirement. Class certification under Rule 23(b)(3) requires that a plaintiff establish "that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. This predominance requirement is necessary because, otherwise, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Ibid.* Though the classwide-damages "calculation[] need not be

exact," at both class certification and trial "courts must conduct a 'rigorous analysis' to determine whether" a plaintiff's damages case is consistent with its liability case. *Id.* at 35 (citation modified).

"We have applied *Comcast* outside the context of antitrust cases." *Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 510 (6th Cir. 2019). And we have also held that *Comcast*'s rigorous-analysis requirement applies to single-theory cases such as this one. *See id.* at 509 ("The district court must ensure that, if the plaintiffs prevail on the merits, any damages calculations match the sole remaining theory of liability."). In *Comcast*, the Supreme Court never suggested that the rigorous-analysis requirement should be cabined based on how many theories a district court considers. *In re VHS of Michigan, Inc.*, 601 F. App'x 342 (6th Cir. 2015), says nothing to the contrary. We recognized there that "*Comcast* applies where multiple theories of liability exist, those theories create separable anticompetitive effects, and the combined effects can result in aggregated damages." *Id.* at 344. However, the "multiple theories of liability" language was not a limiting of *Comcast*'s scope but rather a recognition that "*[i]n such cases*, the plaintiff's model must measure damages attributable only to the liability theory . . . accepted for class-action treatment." *Ibid.* (emphasis added).

*In such cases* — involving multiple theories of liability — we require specifically attributable damages models. But *in all cases* — involving single *or* multiple theories of liability — we require a rigorous analysis of predominance.

A. *Failure to Conduct a Rigorous Analysis*

The district court failed to conduct any analysis at all, let alone a rigorous one, of the Exchange Act claims brought in this case. A district court considering class certification under Rule 23(b)(3) must conduct a "rigorous analysis" to determine that "damages are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 35. Here, however, in addressing damage claims brought under the Exchange Act, the district court rejected FirstEnergy's objections to Plaintiffs' experts in one sentence and concluded without any additional analysis "that predominance exists with respect to damages for the same reasons as articulated in the previous section." *FirstEnergy*, 2023 WL 2709373, at *19.

The problem with this citation to "the previous section" is that this previous section concerned claims brought under the Securities Act, not under the Exchange Act. And these two statutes are fundamentally different in name, statutory focus, and how they treat the question of damages. In its section on the Securities Act claims, the district court first underscored the statutory formulas for damages outlined in section 11(e) (material misrepresentations or omissions in a registration statement) and section 12(a)(2) (untrue statements of material fact in a prospectus or oral communication) of the Securities Act. *Id.* at \*15–16. When such statutory formulas for damages are provided, the district court held, *Comcast* does not bar certification because the formulas reduce individual damages questions and thus predominance exists. *Ibid.*

But the Securities Act and the Exchange Act calculate damages entirely differently. In the world of the Securities Act, "[s]ection 11(e) caps damages against an underwriter in a § 11 suit to the 'total price at which the securities underwritten by him and distributed to the public were offered to the public.'" *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 767 (2023) (quoting 15 U.S.C. § 77k(e)). This formula allows for damages equal to "the difference between the amount paid for the security . . . and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security . . . and the value thereof as of the time such suit was brought." 15 U.S.C. § 77k(e). FirstEnergy concedes that the rigorous-analysis requirement of *Comcast* is inapposite to the Securities Act claims because "the statutory formula itself provides a classwide methodology that satisfies *Comcast*." Appellants' Br. at 48–49.

In the vastly different world of the Exchange Act, however, not only does the statutory text lack any such damage-calculation formula, but the Supreme Court has also explicitly required proof of loss causation, a requirement nowhere in the Securities Act. Though "[t]he securities statutes seek to maintain public confidence in the marketplace," private securities-fraud actions exist "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). "To 'touch upon' a loss is not to *cause*

a loss, and it is the latter that the law requires." *Id.* at 343. Thus, FirstEnergy, leading up to class certification, argued extensively regarding *Comcast* and requested a hearing with live expert testimony to analyze loss causation; all of this reflected a far cry from the "mechanical approach" of Securities Act damages. Appellants' Br. at 49.

The Private Securities Litigation Reform Act of 1995 does not change our fundamental answer that a rigorous analysis of the Exchange Act claims demanded much more from the district court than its cursory reference to the analysis of the Securities Act claims. Neither does section 28(a) of the Exchange Act, which limits recovery in cases under the Exchange Act to "actual damages." 15 U.S.C. § 78bb(a)(1). While both establish a cap or "[l]imitation on damages," 15 U.S.C. § 78u-4(e), an upper limit on damages is an entirely separate concept from the manner in which the damages themselves are calculated. A limit is an adjustment to damages that is only relevant after claimed damages are calculated.

## B. Remand

When presented with a class-certification order that fails to conduct a rigorous analysis, this court generally remands to the district court to perform the analysis in the first instance. *See, e.g.*, *Ford*, 86 F.4th at 726 ("[W]e grant [defendant's] Rule 23(f) petition for interlocutory review, vacate the class certification order, and remand for more searching consideration."); *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 281 (6th Cir. 2018) ("This does not satisfy the 'rigorous analysis' requirement. . . . To the extent that [the district court's class] certification extended to damages calculations, we vacate the certification and remand for further proceedings consistent with this opinion.").

Accordingly, we reverse the district court and remand for the application of *Comcast*'s "rigorous analysis" to determine if Plaintiffs for their Exchange Act claims set forth a methodology for calculating damages on a classwide basis that is susceptible of measurement across the entire class and satisfies the predominance requirement of Rule 23(b)(3).

\*      \*      \*

The Supreme Court's limited mention of *Affiliated Ute* in *Basic* — to broadly discuss the evidentiary usefulness of presumptions and for nothing else on the merits, *Basic*, 485 U.S. at 245 — was where these two presumptions diverged.  The challenge of this case is what "omission" means.  One might think that every misrepresentation "omits" something: either the full truth, or pieces of truth that are necessary to contextualize a full picture.  But the factual and evidentiary context of the *Affiliated Ute* presumption's inception shows that proving that a case is primarily based on omissions, and thus eligible for the *Affiliated Ute* presumption, is a high hurdle to clear.

To analyze what presumption of reliance applies, a federal court must follow a two-step analysis.  First, the court must classify each claim as alleging either an omission or a misrepresentation.  Both half-truths and generic, aspirational corporate statements are misrepresentations.  Second, a case is primarily based on omissions and thus subject to review under the *Affiliated Ute* presumption of reliance only if: (1) the omissions are *not* only the inverse of the misrepresentations, or the omissions are *not* simply the truth that is misrepresented; (2) reliance is *not* practically possible to prove by pointing to a misrepresentation and connecting it to the injury; (3) the preponderance and primary thrust of the claims do *not* involve misrepresentations made by the defendant; *and* (4) the omissions alleged *do* have standalone impact apart from any alleged misrepresentations.  If even one of these four statements is not true, a plaintiff class cannot be granted the powerful medicine of *Affiliated Ute*.  Because all four are not true here, the district court erred when it applied *Affiliated Ute* to Plaintiffs' Exchange Act claims.

We also hold that the district court erred when it did not apply a "rigorous analysis" of the damages methodology for Plaintiffs' Exchange Act claims.

Accordingly, we **VACATE** the class-certification order to the extent that it applied the *Affiliated Ute* presumption of reliance and **REMAND** for the district court to conduct a damages analysis under the proper standard set forth in *Comcast*.

**REMANDED.**